*Governor Wes Moore, et al. v Maryland Hemp Coalition, et al.*, No. 1590, September Term 2023. Opinion by Friedman, J.

**HEADNOTES:**

**ANTITRUST AND TRADE REGULATION — ARTICLE 41 MONOPOLY MARKET DEFINITION**

The first step a litigant must take when alleging an unconstitutional monopoly under Article 41 of the Maryland Declaration of Rights is to define the market that the alleged monopoly controls.

**ANTITRUST AND TRADE REGULATION — EXCEPTIONS TO ARTICLE 41 MONOPOLY — COMMON RIGHT EXCEPTION**

The Hemp Coalition could not establish a likelihood of success on the merits that the Cannabis Reform Act authorized an unconstitutional monopoly under Article 41 of the Maryland Declaration of Rights because the Cannabis Reform Act satisfied the common right exception. Under the common right exception, a monopoly is permissible if it is "given in reference to some matter not of common right." The Court considered whether there was a common right to hemp-derived psychoactive products in both the broader cannabis market and the limited hemp-derived psychoactive products market. The Court held that there was not a common right to hemp-derived psychoactive products in the broader cannabis market because the federal Controlled Substances Act continues to prohibit cannabis products at the federal level. The Court held that there was not a common right to hemp-derived psychoactive products in the limited hemp-derived psychoactive products market because there was a conflict in federal law around the legal status of the products; because Maryland's agricultural hemp laws did not create a common right; because the prohibition of certain hemp-derived psychoactive products for individuals under 21 did not imply a common right for individuals older than 21; and because the lax regulation of hemp-derived psychoactive products in Maryland did not create a common right.

Circuit Court for Washington County
Case No. C-21-CV-23-000348

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>

No. 1590

September Term, 2023

_____

GOVERNOR WES MOORE, ET AL.

v.

MARYLAND HEMP COALITION, ET AL.

_____

Nazarian,
Friedman,
Zic,

JJ.

_____

Opinion by Friedman, J.
Zic, J., joins in the judgment only.

_____

Filed: September 9, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The plant, *Cannabis Sativa L.*, known as cannabis, has been bred into two principal varietals within the single species—hemp and marijuana. The term hemp refers to those varietals of cannabis that have been bred to contain low levels of the psychoactive substance tetrahydrocannabinol (THC), generally below 0.3% by dry weight, and that often have higher concentrations of the non-psychoactive substance cannabidiol (CBD). RENÉE JOHNSON, CONG. RSCH. SERV., RL 32725, HEMP AS AN AGRICULTURAL COMMODITY 2 (2018) [hereinafter AGRICULTURAL COMMODITY]; NORMAN BIRENBAUM, JONATHAN BLAKE, SIERRA MCWILLIAMS, ANDREW GOFF, AND ERIN WILLIAMS, CANNABIS LAW DESKBOOK § 24:3 (2024). These hemp varietals are grown primarily (but not, as we shall see, exclusively) for their industrial applications, including the production of fiber, textiles, foods, and oils. AGRICULTURAL COMMODITY, *supra*, at 2. By contrast, marijuana refers to varietals of cannabis that have been bred for having significantly higher levels of THC. *Id*.; BIRENBAUM ET AL., *supra*, at § 24:2. Marijuana naturally contains a specific variant of THC known as delta-9, and it is this variant of THC that gives marijuana its psychoactive properties. BIRENBAUM ET AL., *supra*, at § 24:2. Recently, hemp has been chemically altered to produce psychoactive effects as well. Chemists, through a process known as isomerization, have developed novel ways of treating hemp to synthetically increase its THC content to make edible or smokeable products with psychoactive properties. Two of the most prominent of these products are delta-8 and delta-10 THC products. We refer to these products as "**hemp-derived psychoactive products**."

The legal status of marijuana and hemp has recently been transformed. As we will discuss in the pages that follow, for the last hundred years or so, cultivation of the cannabis

plant, in either its marijuana or hemp varietals, was illegal in the United States. AGRICULTURAL COMMODITY, *supra*, at 12-13. In recent years, however, those restrictions have been relaxed, but in a patchwork, uneven manner. Generally, it has become legal under both State and federal law to cultivate and sell hemp; it has become legal under the law of some States, including Maryland, but not under federal law, to cultivate and sell marijuana.[1] 7 U.S.C. § 1639p(f); MD. CODE, AGRICULTURE ("AG") § 14-302(1); 21 U.S.C. § 812(c)(c)(10), (17); MD. CONST. art. XX.

This case concerns Maryland's approach to this patchwork legal and regulatory regime. In 2022, Maryland voters amended their Constitution to legalize recreational cannabis use for people 21 and over. The constitutional amendment also directed the Maryland General Assembly to pass legislation regulating the cannabis market. MD. CONST. art. XX, § 1. Accordingly, the General Assembly passed the Cannabis Reform Act

---

[1] As we discuss later, the federal government continues to prohibit marijuana under the Controlled Substances Act. 21 U.S.C. § 812(c)(c)(10), (17). The federal government has generally refrained from enforcing this prohibition against individuals complying with State laws that have legalized marijuana because of an unusual discretionary regime. Alex Kreit, *Federal Nonenforcement in the Face of State Drug Policy Reforms*, 21 OHIO ST. J. CRIM. L. 239, 239-40 (2024). This discretionary regime has two parts: U.S. Department of Justice (DOJ) memos and congressional appropriations riders. *First*, the DOJ has issued memos, most notably the so-called Cole Memo in 2013, discouraging law enforcement from enforcing the federal marijuana prohibition against States and individuals that comply with State marijuana laws. *Id.* at 239 n.1, 257-58 (describing the Cole Memo, written by former U.S. Deputy Attorney General James M. Cole). Although Attorney General Jeff Sessions rescinded this memo in 2018, it continues to be followed by federal law enforcement and subsequent attorneys general. *Id.* at 258. *Second*, a federal congressional appropriations rider continues to prohibit the DOJ from using funds to enforce the federal marijuana prohibition against individuals that comply with State medical marijuana laws specifically. GERALD F. UELMEN & ALEX KREIT, DRUG ABUSE AND THE LAW SOURCEBOOK § 3:92 (2025). This is the discretionary federal regime under which Maryland's Cannabis Reform Act exists.

in 2023. The Cannabis Reform Act is a comprehensive statute that regulates the licensing, sale, marketing, and enforcement of hemp-derived psychoactive delta-8 and delta-10 THC products together with traditional delta-9 THC products. MD. CODE, ALCOHOLIC BEV. ("AB") § 36-1102. Thus, the Cannabis Reform Act regulates what we refer to collectively as "**cannabis products**"—edible or smokable products that contain psychoactive cannabis compounds regardless of the plant of origin. In addition to those core regulatory functions, the Cannabis Reform Act also established social equity programs to remedy the harm caused by the so-called War on Drugs, implemented public health programs to ensure individuals use cannabis products safely, and made financing more accessible to licensed businesses selling cannabis products.[2] 2022 Md. Laws ch. 26 at 1; 2023 Md. Laws ch. 254 at 94, 97-98.

The Maryland Hemp Coalition, along with several hemp retailers, producers, farmers, and consumers (collectively, the Hemp Coalition), challenges the constitutionality

---

[2] One of the General Assembly's goals in enacting the Cannabis Reform Act was to rectify the harm that the War on Drugs inflicted on Maryland communities. *See* H. ECON. MATTERS COMM., FLOOR REP., H.B. 556, 2023 Leg., 445th Sess., at 1 (Md. 2023) ("The bill addresses a shift in our society's approach to cannabis … away from the [W]ar on [D]rugs[.]"). The War on Drugs can be defined as a law enforcement campaign by the federal government, States, and their subdivisions against the use and possession of psychoactive substances that began under the Nixon administration in the 1970's and was expanded under the Reagan administration in the 1980's. *See* Jelani Jefferson Exum, *Reconstruction Sentencing: Reimagining Drug Sentencing in the Aftermath of the War on Drugs*, 58 AM. CRIM. L. REV. 1685, 1686 (2021) (defining the War on Drugs); Jennifer D. Oliva & Taleed El-Sabawi, *The "New" Drug War*, 110 VA. L. REV. 1103, 1111-15 (2024) (describing the development of the War on Drugs as it relates to opium, cocaine, cannabis, and other substances). For purposes of this Opinion, when we refer to the War on Drugs, we refer to the enforcement of the prior prohibition on cannabis products specifically.

of the Cannabis Reform Act solely under the Maryland State Constitution. In particular, the Hemp Coalition brings claims under Articles 24 and 41 of the Maryland Declaration of Rights and Article III, Section 40 of the Maryland Constitution in the Circuit Court for Washington County. The Hemp Coalition challenges the Cannabis Reform Act's cannabis licensing requirement, which prohibits businesses from selling certain cannabis products, including hemp-derived psychoactive products, unless they obtain a cannabis license. AB § 36-1102(b)(1). It moved to enjoin the enforcement of the Cannabis Reform Act based on its State constitutional claims.[3] The circuit court enjoined Governor Wes Moore and several other named State officials and agencies (collectively, the State) from enforcing this licensing requirement on people selling hemp-derived psychoactive products, but permitted the State to continue to issue cannabis licenses. The State here appeals the entry of that preliminary injunction, and the Hemp Coalition cross-appeals, alleging the circuit court should have also enjoined the issuance of cannabis licenses. As to the State's appeal, we reverse the grant of the preliminary injunction. As to the Hemp Coalition's cross-appeal, we affirm the circuit court's decision to permit the State to continue issuing cannabis licenses. The result is that the State may enforce the Cannabis Reform Act's

---

[3] The Hemp Coalition and other parties not part of this case separately challenged and sought to enjoin the enforcement of the Cannabis Reform Act's licensing requirement under the United States Constitution and federal civil rights law in the United States District Court for the District of Maryland. *Charm City Hemp, LLC v. Moore*, No. 1:25-CV-01744-JRR, 2025 WL 2165173, at *6-7 (D. Md. July 30, 2025). The federal court denied the preliminary injunction, *id.* at *1, and as we describe below, we similarly reverse the preliminary injunction granted by the circuit court. Given the procedural and factual similarities between *Charm City Hemp* and the instant case, we note the federal court's findings and analysis throughout this Opinion.

licensing requirement against individuals selling hemp-derived psychoactive products, and the State can continue to issue new cannabis licenses. While this case turns on the State's ability to enforce the licensing requirement against hemp-derived psychoactive products, the parties have not addressed the legality of these products. As we explain below, Hemp-derived psychoactive products, so-called delta-8 and delta-10 THC, are now and have always been illegal in Maryland. That the prohibition has been the subject of lax enforcement does not make it legal.

## BACKGROUND

We begin by discussing the regulatory environment governing hemp and hemp-derived psychoactive products prior to the enactment of the Cannabis Reform Act. We then describe the Cannabis Reform Act itself before explaining the events that led to this appeal.

### I. Regulatory History

For decades, the cultivation and use of hemp was illegal at the federal level. AGRICULTURAL COMMODITY, *supra*, at 12-13. The 1937 Marihuana Tax Act discouraged hemp production and limited growing to those with a federal registration. *Id.* at 13; Marihuana Tax Act of 1937, Pub. L. No. 75-238, 50 Stat. 551. As a result, by 1958, hemp cultivation was nonexistent in the United States. *See* Courtney N. Moran, *Industrial Hemp: Canada Exports, United States Imports*, 26 FORDHAM ENV'T L. REV. 383, 405-06 (2015). The passage of the Controlled Substances Act of 1970 made growing hemp illegal in the United States. *See id.* at 406-08 (describing the effect of the Controlled Substances Act on hemp); Controlled Substances Act of 1970, Pub. L. No. 91-513, 84 Stat. 1242.

5

The federal Agricultural Act of 2014, known as the 2014 federal Farm Bill, was the first bill to permit hemp cultivation, but that permission was limited to non-commercial purposes. Pub. L. No. 113-79, 128 Stat. 649. The 2014 federal Farm Bill permitted hemp cultivation only for research purposes and only within States that had laws permitting the cultivation of hemp. 7 U.S.C. § 5940(b) (repealed 2022). Thus, while hemp could be cultivated for research purposes, it remained a Schedule 1 drug under the Controlled Substances Act. 21 U.S.C. § 812(c)(c)(17) (1970) (amended 2018).

The federal Agriculture Improvement Act of 2018, known as the 2018 federal Farm Bill, authorized the commercial cultivation of hemp. 7 U.S.C. § 1639q (directing the USDA to create commercial regulatory plan for hemp production); *Charm City Hemp, LLC v. Moore*, No. 1:25-CV-01744-JRR, 2025 WL 2165173, at *2 (D. Md. July 30, 2025). The 2018 federal Farm Bill authorized hemp cultivation by excluding hemp from the definition of marijuana in the Controlled Substances Act. 21 U.S.C. § 812(c)(c)(17). In excluding hemp from the definition of marijuana, the 2018 federal Farm Bill defined hemp as any part of the cannabis plant with a delta-9 THC concentration of 0.3% or less on a dry weight basis, including the derivatives, extracts, isomers, and other byproducts of the plant. 7 U.S.C. § 1639o(1). The 2018 federal Farm Bill granted States "primary regulatory authority over the production of hemp" if a State submitted a regulatory plan to the U.S. Department of Agriculture. 7 U.S.C. § 1639p(a)(1). Accordingly, in 2020, the Maryland

6

Department of Agriculture submitted Maryland's State hemp plan to the USDA.[4] The 2018 federal Farm Bill created regulatory uncertainty about the status of hemp-derived psychoactive products. *See* BIRENBAUM ET AL., *supra*, at § 25:10. While it permitted hemp cultivation for industrial purposes, it failed to define the legal status of hemp-derived psychoactive products, *id.*, and this may have contributed to businesses in Maryland and across the country selling these products. *Charm City Hemp*, 2025 WL 2165173, at *2 (finding that the 2018 federal Farm Bill led to the proliferation of unregulated hemp-derived psychoactive products).

In Maryland in 2019, the General Assembly legalized hemp cultivation but placed restrictions on hemp-derived psychoactive products. The General Assembly legalized hemp cultivation by excluding hemp from the definition of marijuana under Maryland's Controlled Substances Act. MD. CODE, CRIMINAL LAW ("CR") § 5-101(e-1)(2). The General Assembly made clear, however, that the agricultural hemp cultivation authorized under Maryland's State hemp plan did not also authorize the use or creation of hemp-derived psychoactive products. *See* AG § 14-101(c)(2) ("'Hemp' does not include any plant or part of a plant intended for a use that is regulated under [Maryland's former medical cannabis program]."); AG § 14-302(1) ("It is the intent of the General Assembly that … [h]emp be established as an agricultural commodity"); *Charm City Hemp*, 2025 WL 2165173, at *2 ("Maryland House Economic Matters Committee [Chair] C.T. Wilson

---

[4] The circuit court erroneously found that the State had failed to submit a hemp plan to the USDA and that, as a result, the 2018 federal Farm Bill preempted the Cannabis Reform Act. This issue is discussed *infra* at State's Appeal Section I.A.

7

not[ed] the marketplace of hemp products developed 'merely to get someone high, which was never the intent of this legislature.'"); *see also* MD. CODE, HEALTH–GENERAL ("HG") §§ 13-3301 to -3316 (Natalie M. Laprade Medical Cannabis Commission) (repealed 2023). Thus, the General Assembly legalized hemp cultivation and use in certain products, but only if those products were not psychoactive.

Then, in 2022, the Maryland General Assembly passed legislation that prohibited the sale of delta-8 and delta-10 THC products to individuals under 21. CR § 10-108. Under the legislation, "[a] person who distributes products containing delta-8- or delta-10-[THC] … may not distribute, purchase for sale, or sell a product containing delta-8- or delta-10-[THC] to an individual under the age of 21 years." CR § 10-108(a). As we shall discuss later in this Opinion, this prohibition on people under 21 did not impliedly legalize hemp-derived psychoactive products for people 21 and older. Instead, it was a piecemeal measure designed to protect those most vulnerable to hemp-derived psychoactive products while the General Assembly developed a comprehensive regulatory scheme. *See infra* State's Appeal Section I.B.2.a.

Based on the regulatory history of hemp and the products derived from it, the legal status of hemp-derived psychoactive products in Maryland prior to the enactment of the Cannabis Reform Act was clear. While these products may have proliferated during the period of regulatory uncertainty created by the 2018 federal Farm Bill, BIRENBAUM ET AL., *supra*, at § 25:10, Maryland law prohibited the use or creation of hemp-derived psychoactive products.

## II.     The Cannabis Reform Act

In 2022, Maryland voters approved a constitutional amendment that legalized cannabis use by adults and ordered the Maryland General Assembly to regulate cannabis:

> (a)     Subject to subsection (b) of this section, on or after July 1, 2023, an individual in the State who is at least 21 years old may use and possess cannabis.

> (b)     The General Assembly shall, by law, provide for the use, distribution, possession, regulation, and taxation of cannabis within the State.

MD. CONST. art. XX, § 1.[5]

In crafting the regulatory scheme mandated by the constitutional amendment, the General Assembly considered how to regulate the broader cannabis market, including both hemp-derived psychoactive products and marijuana. AB § 36-1102(a)(3)(i). Accordingly, it instructed the Maryland Medical Cannabis Commission to conduct a baseline study of cannabis use in the State and to draft a report that recommended methods to prevent cannabis use by minors. HG § 13-4504(a)(8); TIFFANY RANDOLPH & WILLIAM TILBURG,

---

[5] This regulatory authorization by the People to the Maryland General Assembly is not and should not be read as an implied limitation on the General Assembly. The General Assembly has plenary power to legislate on all topics subject only to the limitations imposed by the United States Constitution, federal law, treaties, or by the Maryland Constitution. *See Schisler v. State*, 394 Md. 519, 590 n.51 (2006); *Leser v. Lowenstein*, 129 Md. 244, 255 (1916) ("In the State Constitution we look, not for the power of the General Assembly to adopt an enactment, but for a prohibition against its adoption."). The constitutional amendment does not change or limit the General Assembly's pre-existing plenary power to regulate all aspects of the cannabis market. Instead, it should be read to encourage the General Assembly to regulate that market. *Cf. Hill v. Mayor and Town Council of Colmar Manor*, 210 Md. 46, 53 (1956) (holding that "the [l]egislature has plenary powers which are not restricted by the provisions of Article I of the Constitution of Maryland with regard to both primary elections and municipal elections" besides Baltimore City elections).

MARYLAND MEDICAL CANNABIS COMMISSION, LEGISLATIVE REPORT: CANNABIS REFORM: BEST PRACTICES FOR A MEDICAL CANNABIS HOME GROW PROGRAM, ON-SITE CANNABIS CONSUMPTION FACILITIES, AND METHODS TO REDUCE CANNABIS USE BY MINORS (2022) [hereinafter REPORT ON CANNABIS USE BY MINORS].

The General Assembly also recognized the significance of hemp-derived psychoactive products and, in turn, instructed the Maryland Medical Cannabis Commission to draft a report that recommended policies for regulating such products. 2022 Md. Laws ch. 511. The report on hemp-derived psychoactive products explained that the market for unregulated hemp-derived psychoactive products accelerated after the 2018 federal Farm Bill was enacted. TIFFANY RANDOLPH & WILLIAM TILBURG, MARYLAND MEDICAL CANNABIS COMMISSION, LEGISLATIVE REPORT: HEMP-DERIVED NON-DELTA-9-[THC] PRODUCTS 5 (2022) [hereinafter HEMP-DERIVED PSYCHOACTIVE PRODUCTS REPORT]. Taken together, the reports on hemp-derived psychoactive products and on cannabis use guided the General Assembly in enacting a law regulating the broader cannabis market.

To carry out the regulatory mandate created by the constitutional amendment, the Maryland General Assembly enacted the Cannabis Reform Act.[6] The Cannabis Reform Act altered myriad areas of Maryland law. Its substantive changes include alterations to

---

[6] The regulatory scheme is the product of two bills. The first bill was passed in 2022. 2022 Md. Laws ch. 26. While some of the provisions took effect in 2022, most did not take effect until 2023. *Id.* at 55. The second bill, passed in 2023, established the licensing scheme that is at the center of this dispute. 2023 Md. Laws ch. 254 at 88. Because the second bill was emergency legislation, it took effect when signed by the Governor on May 3, 2023. 2023 Md. Laws ch. 254 at 115; MD. CONST. art. XVI, § 2.

the criminal law to reflect the now-legal status of cannabis products; a prohibition on synthetic cannabis products, including delta-8 and delta-10 THC products; the creation of a new regulatory scheme to license businesses selling cannabis products; policies to remedy the harms caused by the War on Drugs; public health initiatives involving cannabis; and updates to banking and tax law to accommodate businesses selling cannabis products. We summarize these changes below.

The Cannabis Reform Act alters several provisions of Maryland criminal law to reflect that the use and possession of cannabis is now legal in some circumstances. The Cannabis Reform Act established the "personal use amount" of cannabis product that an adult can legally use or possess.[7] CR §§ 5-101(u), 5-601(a)(1)(ii). It also created a "civil use amount" in which a person may face a civil penalty if they possess that amount of cannabis.[8] CR §§ 5-101(e-2), 5-601.1(a). Besides establishing use amounts, the Cannabis Reform Act also authorized resentencing and expungements of certain cannabis-related crimes. MD. CODE, CRIMINAL PROCEDURE §§ 10-105.3, -110.

Significantly, the Cannabis Reform Act bans the sale of most hemp-derived psychoactive products. It does so by prohibiting products "not derived from naturally

---

[7] The personal use amount is defined as follows: "(1) an amount of usable cannabis that does not exceed 1.5 ounces; (2) an amount of concentrated cannabis that does not exceed 12 grams; (3) an amount of cannabis products containing delta-9[][THC] that does not exceed 750 milligrams; or (4) two or fewer cannabis plants." CR § 5-101(u).

[8] The civil use amount is defined as follows: "(1) an amount of usable cannabis that exceeds 1.5 ounces but does not exceed 2.5 ounces; (2) an amount of concentrated cannabis that exceeds 12 grams but does not exceed 20 grams; or (3) an amount of cannabis products containing delta-9[][THC] that exceeds 750 milligrams but does not exceed 1,250 milligrams." CR § 5-101(e-2).

occurring biologically active chemical constituents." AB § 36-1102(c). Thus, because hemp-derived psychoactive products, including delta-8 and delta-10 THC, are derived from a chemical process that combines hemp and CBD, these products are prohibited. *Id.*; BIRENBAUM ET AL., *supra*, at § 25:10. The floor report on the Cannabis Reform Act from the House Economic Matters Committee describes this provision in more detail:

> Q.   What is delta-8-THC and how are products derived from it treated in the bill?
>
> A.   Delta-8[]THC is a cannabinoid produced naturally by the cannabis plant that has psychoactive effects similar to delta-9[]THC. The natural concentration of delta-8-THC in cannabis plants is very low, so manufacturers of products derived from delta-8[]THC typically use chemical processes to convert other cannabinoids, like CBD, into delta-8[]THC. Consequently, the sale or distribution of many products derived from delta-8[]THC is prohibited under § 36–1103(b) of the Alcoholic Beverages and Cannabis Article because such products are "not derived from naturally occurring biologically active chemical constituents."

H. ECON. MATTERS COMM., FLOOR REP., H.B. 556, 2023 Leg., 445th Sess., at 12 (Md. 2023) [hereinafter H.B. 556 Floor Report]; *see infra* note 16 (describing significance of floor report as legislative history). The provision in the Cannabis Reform Act referred to in the floor report as AB § 36-1103(b) was eventually codified as AB § 36-1102(c). *Compare* H.B. 556, 2023 Leg., 445th Sess., at 69-70 (Md. 2023) (as reported by H. Econ. Matters Comm., Feb. 3, 2023), *with* H.B. 556, 2023 Leg., 445th Sess., at 88-89 (Md. 2023) (enacted).

For those products that are derived from naturally occurring biologically active chemical compounds, such as delta-9 THC, the Cannabis Reform Act establishes a

licensing scheme administered by the Maryland Cannabis Administration. AB §§ 36-401 to -411. Under this framework, businesses may only sell edible or smokeable products containing psychoactive levels of cannabis if the businesses have a license. AB § 36-1102(b)(1). The Cannabis Reform Act limits the number of licenses that may be granted. AB § 36-401. Once a business is awarded a license, its cannabis products are subject to product safety regulations, including manufacturing, testing, packaging and labeling, and advertising requirements. AB §§ 36-1102(b)(1), -902 to -903.

The Cannabis Reform Act specifies how businesses may apply for and receive cannabis licenses. AB § 36-404. Each applicant must pay a license application fee. AB § 36-403(c). The Cannabis Reform Act contemplates several rounds in which cannabis licenses will be granted. AB § 36-404(d)-(h). The chance of an applicant receiving a license in any given round depends on two components: a lottery component and a social equity component. AB § 36-404; AB § 36-101(ff). At some stages of the licensing process, social equity applicants receive priority. *See, e.g.*, AB § 36-404(d)(1).

Next, the General Assembly, recognizing the harm the War on Drugs has had on marginalized communities in Maryland, dedicated a significant portion of the Cannabis Reform Act to establishing equitable initiatives to remedy those harms. *See* H.B. 556 Floor Report at 1 ("The bill addresses a shift in our society's approach to cannabis, a shift that was confirmed by the voters – away from the [W]ar on [D]rugs, away from tearing up our communities."). Those equitable initiatives include the social equity applicant program, funds that support minority communities harmed by the War on Drugs, and the creation of

13

the Office of Social Equity, which oversees these initiatives. MD. CODE, ECONOMIC DEVELOPMENT § 5-1901; AB §§ 1-3A-03; 1-323, 36-1403; AB § 1-309.1.

The Cannabis Reform Act also establishes public health initiatives to safely implement the legalization of cannabis products. HG §§ 13-4504 to -4505; AB § 36-601. These initiatives fund studies that review how the legalization of cannabis affects cannabis use and misuse; they fund education, counseling, and treatment programs involving cannabis use and misuse; and they fund programs that provide medical cannabis to those enrolled in medical assistance programs and veteran's health programs. HG §§ 13-4504 to -4505; AB § 36-601.

Finally, the Cannabis Reform Act regulates businesses selling now-legal cannabis products by folding them into Maryland's tax and financial system. First, the Cannabis Reform Act levies a sales and use tax on cannabis products. MD. CODE, TAX – GENERAL ("TG") § 11-104(k). The tax partly funds some of the public health initiatives created by the Cannabis Reform Act. TG § 2-1302.2. Second, the Cannabis Reform Act encourages financial institutions to work with licensed businesses. *See* AB § 36-1503. It does so by protecting financial institutions, such as banks and other lenders, from being penalized for serving cannabis businesses. *Id.*

The Cannabis Reform Act went into effect on May 3, 2023. 2023 Md. Laws ch. 254 at 115.

## III.    Procedural History

In July 2023, the Hemp Coalition filed suit in the Circuit Court for Washington County, seeking a declaratory judgment that the Cannabis Reform Act's licensing scheme

14

violates Articles 24 and 41 of the Maryland Declaration of Rights and Article III, Section 40 of the Maryland Constitution.[9] The Hemp Coalition sought a preliminary injunction. Following a two-day hearing, the circuit court granted a preliminary injunction and enjoined the State from "enforcing [AB] § 36-1102 against any person who was already lawfully in the business of selling hemp[-]derived products prior to July 1, 2023."[10] These businesses were thus allowed to continue operating. At the same time, the circuit court permitted the State to continue its process for granting new cannabis licenses. In response to the preliminary injunction order, the State noted a timely appeal. The Hemp Coalition noted a timely cross-appeal.

## DISCUSSION

Each side of this case claims the circuit court erred. The State argues that the circuit court erred in partially granting the preliminary injunction preventing the enforcement of the Cannabis Reform Act's prohibition against businesses selling hemp-derived

---

[9] The Hemp Coalition sought a declaratory judgment that the Cannabis Reform Act was an unconstitutional taking under Article III, Section 40 of the Maryland Constitution. When it granted in part the preliminary injunction that is the subject of this appeal, the circuit court did not analyze whether the Cannabis Reform Act constituted a taking. Additionally, on appeal, neither the Hemp Coalition nor the State raise the taking issue. As a result, we decline to consider it.

[10] First, we note that the Cannabis Reform Act took effect on May 3, not July 1. *See supra* note 6. Second, as we will discuss, this ruling covers, in effect, an empty set as there was no one who was lawfully selling hemp-derived psychoactive products before May 3, 2023. *See infra* State's Appeal Section I.B.2.a. As a result, we could perhaps affirm an order that enjoins nobody from doing anything. Nevertheless, because we understand the circuit court to have intended to enjoin the State from prohibiting the sale of hemp-derived psychoactive products, and because the State has complied with that prohibition, we think the better course is to reverse.

psychoactive products. The Hemp Coalition argues that the circuit court's injunction did not go far enough because it failed to extend the preliminary injunction to prevent the ongoing issuance of cannabis licenses. For the reasons we shall explain, we reverse the grant of the preliminary injunction and affirm the circuit court's decision to permit the State to continue issuing licenses.

## THE STATE'S APPEAL

The State argues that the circuit court abused its discretion in granting the preliminary injunction. To establish the right to a preliminary injunction, the moving party must prove four factors: (1) the likelihood of success on the merits; (2) the balance of convenience; (3) the public interest; (4) irreparable injury to the plaintiff. *Ademiluyi v. Egbuonu*, 466 Md. 80, 114 (2019). Although courts previously defined the preliminary injunction analysis as a pure balancing test, recent cases have concluded that the movant must independently prove all four factors to prevail. *Id.* at 115 ("[F]ailure to prove the existence of even one of the four factors will preclude the grant of preliminary injunction relief." (citation omitted)). The first factor—likelihood of success—is reviewed without deference to the circuit court. *Id.* The remaining three factors are reviewed for abuse of discretion. *Id.* We also review whether the circuit court properly granted the preliminary injunction, as a whole, under an abuse of discretion standard. *Id.* at 93.

In reviewing the circuit court's grant of the preliminary injunction, we are bound to presume the constitutionality of the Cannabis Reform Act, just as we do all laws passed by the Maryland General Assembly. *Spiegel v. Bd. of Educ. of Howard Cnty.*, 480 Md. 631, 645 (2022). We presume these laws are constitutional because, first, the General Assembly

16

is bound by and is presumed to follow the Maryland Constitution. *See Richards Furniture Corp. v. Bd. of Cnty. Comm'rs of Anne Arundel Cnty.*, 233 Md. 249, 261 (1963) ("[A]n act which has been duly authenticated and published as law … bears a strong presumption that all constitutional provisions have been complied with … and this presumption continues to exist until the contrary is *clearly* made to appear." (emphasis in original)). Second, we presume that State laws are constitutional because Article 8 of the Maryland Declaration of Rights, which guarantees the separation of powers among the legislative, executive, and judicial departments, grants the General Assembly "complete power 'for all purposes of civil government'" unless "there is a specific prohibition in the Maryland Constitution or Declaration of Rights that plainly provides otherwise[.]" *Spiegel*, 480 Md. at 645 (citation omitted). Thus, we presume the Cannabis Reform Act is constitutional, and we will not usurp the General Assembly's authority to enact the Cannabis Reform Act unless it "plainly contravenes" the Maryland Declaration of Rights. *Md. State Bd. of Educ. v. Bradford*, 387 Md. 353, 387 (2005) (citation omitted).

In addition to the presumption of constitutionality, the Hemp Coalition brings a facial challenge to the Cannabis Reform Act, which imposes an additional burden. To succeed on a facial constitutional challenge, a litigant "must establish that no set of circumstances exist under which the Act would be valid." *Pizza di Joey, LLC v. Mayor & City Council of Baltimore*, 241 Md. App. 139, 165 (2019) (citation omitted), *aff'd,* 470 Md. 308 (2020). "Facial constitutional challenges are generally disfavored because they carry the risk of 'premature interpretation of statutes on the basis of factually barebones

17

records.'" *Id.* (citation omitted). Thus, the Hemp Coalition bears the burden to establish that the Cannabis Reform Act would not be valid under any set of circumstances.

We conclude that the circuit court erred as a matter of law in finding that the Hemp Coalition was likely to succeed on the merits. This holding is outcome determinative. Nevertheless, following our discussion of the factor of likelihood of success, we briefly address the remaining three factors.

## I.      LIKELIHOOD OF SUCCESS ON THE MERITS

To prove that there is a likelihood of success on the merits, the movant must establish a "real probability of prevailing on the merits, not merely a remote possibility of doing so." *Ademiluyi*, 466 Md. at 115 (citation omitted). The circuit court found that the Hemp Coalition was likely to succeed on the merits on three grounds: (A) that the 2018 federal Farm Bill preempts the Cannabis Reform Act's licensing scheme; (B) that the Cannabis Reform Act violated Article 41 of the Maryland Declaration of Rights; and (C) that the Cannabis Reform Act violated Article 24 of the Maryland Declaration of Rights. With the presumption of constitutionality and the burden imposed in making a facial challenge in mind, we review each of the circuit court's findings.

### A.      Preemption

First, the circuit court erred as a matter of law in finding that the 2018 federal Farm Bill preempted the Cannabis Reform Act. It found, on its own initiative, that the 2018 federal Farm Bill preempted the Cannabis Reform Act's licensing scheme because it found that the State had failed to submit a regulatory plan to the USDA. The circuit court explained its reasoning as follows:

[the Hemp Coalition] testified that they had obtained the appropriate federal licenses. They did so because the State of Maryland has chosen *not* to submit a plan of its own for approval by USDA.… [I]n the event the State does not submit a plan for approval, hemp producers must obtain a federal license … to legally operate in Maryland. [The State] wrongly quote[s] the [2018 federal Farm Bill] that Congress does not intend to preempt the States because that statement is premised upon a [S]tate having first submitted a plan for approval. Maryland has not submitted such a plan prior to passing the [Cannabis Reform Act]… The [S]tate having failed to avail itself of the opportunity to establish its own hemp licensing scheme, licensing remains with USDA.

(emphasis added). The circuit court's finding in this regard is predicated on a factual error.

The circuit court found that Maryland had not submitted a hemp plan to the USDA. In fact, Maryland did submit a hemp plan in 2020. The Maryland Department of Agriculture submitted Maryland's State hemp plan as found on the USDA's website. U.S. DEP'T OF AGRIC., *Status of State and Tribal Hemp Production Plans for USDA Approval*, https://perma.cc/9EPR-D292 (last updated Aug. 28, 2024). Neither party contests this fact. As a result, by the plain text of the federal law, Maryland's law is not preempted. The Hemp Coalition has no likelihood of succeeding in any argument regarding preemption.

    B.    <u>Article 41 Claim</u>

Next, the circuit court found that the Hemp Coalition was likely to succeed on the merits of its claim that the Cannabis Reform Act creates an unconstitutional monopoly under Article 41 of the Maryland Declaration of Rights. Below, we (1) provide the background on Article 41 and (2) explain why the Cannabis Reform Act does not create an unconstitutional monopoly.

## 1. *Background on Article 41*

Article 41 of the Maryland Declaration of Rights declares "[t]hat monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered." MD. CONST., Decl. of Rights Art. 41. Article 41 was included in the adoption of the Maryland Declaration of Rights in 1776 and the text has remained unchanged through each readoption. Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, 71 TEMPLE L. REV. 637, 672 (1998) [hereinafter *History, Development, and Interpretation*]. Maryland was the first State to adopt a constitutional anti-monopoly provision. Joyce A. McCray Pearson, *The Federal and State Bills of Rights: A Historical Look at the Relationship Between America's Documents of Individual Freedom*, 36 HOW. L.J. 43, 52 (1993). Article 41 likely originated in English common law, from which emerged the proposition that monopolies that infringe on a common right or trade are unlawful.[11] 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 181 (1797) ("[A] [person's] trade is accounted [their] life, because it maintain[s] [their] life; and therefore the monopolist that take[s] away a [person's] trade, take[s] away

---

[11] Two other theories explaining the history of State anti-monopoly provisions are notable. Gordon Wood suggests that State constitutional prohibitions on monopolies reflect the republican doctrine of equality such that prohibiting monopolies "would prevent the perpetuation of privilege and the consequent stifling of talent." GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787, at 70-72 (1993 ed.). Another theory suggests the prohibition on monopolies may have been added as "a reaction to recent commercial experience under the English Navigation Acts," by which the English Parliament had purported to require all colonial goods to be shipped on British vessels with British crews. ROBERT ALLEN RUTLAND, THE BIRTH OF THE BILL OF RIGHTS 1776-1791, at 52 (1955). This English monopoly was an important colonial grievance.

[their] life, and therefore is so much more the odious.") (quotation modified to modernize verbs and use singular "they"); The Case of Monopolies (1603) 77 Eng. Rep. 1260, 1263; 10 C.O. Rep. 85 b. ("[Monopolies lead] to the impoverishment of divers artificers and others, who before, by the labour of their hands in their art or trade, had maintained themselves and their families, who now will of necessity be constrained to live in idleness and beggary[.]"). The text and history of Article 41 thus suggest that the purpose of the prohibition against monopolies was to protect an individual's ability to work in a lawful profession.

Generally, a monopoly is "[t]he market condition existing when only one economic entity produces a particular product or provides a particular service." *Monopoly*, BLACK'S LAW DICTIONARY (12th ed. 2024). Maryland's highest court has defined an unconstitutional monopoly under Article 41 as follows:

> A monopoly within the prohibition of our Declaration of Rights, is a privilege or power to command and control traffic in some commodity, or the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by common right.

*Levin v. Sinai Hosp. of Baltimore City*, 186 Md. 174, 182 (1946). Thus, under Article 41, an unconstitutional monopoly is an exclusive grant given by the State to operate a business in a particular industry.[12] *Id.* at 183. This definition can be contrasted with regulatory

---

[12] Maryland courts have not clarified whether Article 41 applies to monopolies in the private sector, although Maryland's highest court has suggested that it might. *Grempler*

restrictions that apply equally to all individuals, which courts have determined are not unconstitutional monopolies and do not violate Article 41. *See Supermarkets Gen. Corp. v. State*, 286 Md. 611, 626-27 (1979) (holding Sunday closing laws did not create a monopoly because they applied equally to all businesses); *Wright v. State*, 88 Md. 436, 443 (1898) (holding a prohibition on butter subsidies did not create a monopoly because the prohibition applied equally to all producers). Even if a State grant satisfies the definition of an unconstitutional monopoly, it may nevertheless be permissible if it falls under certain well-established exceptions. *Levin*, 186 Md. at 182-83. In particular, a State grant does not violate Article 41 if either (1) the monopoly grant is "given in reference to some matter not of common right"; or (2) the monopoly grant is "reasonably required for [the] protection of some public interest." *Id.* at 183; *Raney v. Montgomery Cnty. Comm'rs*, 170 Md. 183, 192 (1936).[13] A State grant satisfies the public interest exception if it protects the public

---

*v. Multiple Listing Bureau of Harford Cnty., Inc.*, 258 Md. 419, 424 n.2 (1970). Because the Hemp Coalition here alleges a State-granted monopoly exists, we need not opine on whether Article 41 could act as a prohibition against private monopolies.

[13] A State grant could also be permissible under a third exception: that the State grant was given "in return for some public service." *Levin*, 186 Md. at 183. We don't see how the exception could apply to this case because the cannabis licenses granted under the Cannabis Reform Act are not being given to cannabis licensees because they performed a public service. Regardless, neither the circuit court nor the parties addressed this exception below. The parties also did not raise this exception on appeal. Accordingly, we do not decide whether it applies here. MD. R. 8-131(a) ("Ordinarily, an appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."); MD. R. 8-504(a)(6) (requiring "[a]rgument in support of the party's position on each issue" in appeal briefs).

health. *See Raney*, 170 Md. at 192-93 (determining exclusive grant does not violate Article 41 "when the business affected is inherently dangerous to society").[14]

### 2. Application of Article 41 to the Cannabis Reform Act

The first step a litigant must take in any monopoly case is to define the market that the alleged monopoly controls. This step is a key component of federal antitrust law. *See* DANIEL FRANCIS & CHRISTOPHER JON SPRIGMAN, ANTITRUST: PRINCIPLES, CASES, AND MATERIALS 69 (3d ed. 2025) (describing how initially defining the theory of harm and the market in antitrust litigation is "almost invariably expected by judges, and is often the central issue in antitrust investigations and litigations"); *Ohio v. Am. Express Co.*, 585 U.S.

---

[14] Our sister States that have constitutional anti-monopoly provisions agree with many of the principles outlined by Maryland courts. At least 21 States have adopted explicit anti-monopoly provisions in their constitutions. Steven Gow Calabresi, James Lindgren, Hannah M. Begley, Kathryn L. Dore & Sarah E. Agudo, *Individual Rights Under State Constitutions in 2018: What Rights Are Deeply Rooted in a Modern-Day Consensus of the States?*, 94 NOTRE DAME L. REV. 49, 106 n.280 (2018). Many of these States permit monopolies under certain exceptions. For example, courts in North Carolina agree with Maryland courts that laws granting exclusive licenses to practice a profession will be upheld against a constitutional challenge if they serve a public interest. *See, e.g.*, *St. George v. Hardie*, 60 S.E. 920, 923 (N.C. 1908) ("[Lawmakers have] the right to require an examination … of persons desiring to practice law or medicine, to teach, to be druggists, pilots, engineers, or exercise other callings … affecting the public …. To require this … is in no sense the creation of a monopoly[.]"). Other courts also follow the public interest exception regarding monopolies. *See, e.g.*, *Gipson v. Morley*, 233 S.W.2d 79, 83 (Ark. 1950) (upholding liquor price controls and stating "Arkansas … ha[s] sustained these monopolistic grants … on the ground that it is within the competency of the [L]egislature … in controlling a type of business fraught with perils to public peace, health, and safety as is the liquor business."); *Favaloro v. Comm'n for Law. Discipline*, 994 S.W.2d 815, 823 (Tex. App. 1999) (rejecting monopoly challenge against Texas State bar because "[t]he practice of law is potentially harmful to the public if practiced by unqualified persons."). Our review of other State constitutions and State caselaw shows that exclusive State grants are generally held not to violate anti-monopoly provisions if they serve the public interest.

529, 544 (2018) (defining, in an antitrust case, the credit-card market as including both merchants and cardholders). Likewise, we hold that litigants mounting an Article 41 challenge must first define the market that the alleged monopoly controls. Although no previous Maryland case has so held, we think that is only because in the prior cases, the market that was allegedly subject to a monopoly was obvious and didn't merit close analysis. Here, however, identifying the relevant market is critical. The parties did not attempt to define the relevant market. While defining the relevant market is often a factual issue requiring factfinding in the circuit court about the size of the market, the products involved, and the size of the monopoly in relation to the market, because it is obvious here that there are only a few markets under the Cannabis Reform Act that a potential monopoly could cover, we decide the relevant market as a matter of law. We pause to consider the choices:

- The relevant market could be the market for *all* psychoactive products, including hemp-derived psychoactive products and marijuana products, alcohol, and other drugs, whether they be prescription, over-the-counter, or illegal. The Cannabis Reform Act doesn't regulate that entire market or create a monopoly in it. We shall consider this potential market no further;

- The relevant market could be the market for *all* products of the cannabis plant. If this is the market, it would include industrial hemp products (like ropes and textiles), non-psychoactive edible or smokeable products like CBD, hemp-derived psychoactive products of the type that the members of the Hemp Coalition sell, and marijuana products. If this is the proposed market, then the Cannabis Reform Act does not create a monopoly because it does not regulate the sale of industrial or non-psychoactive hemp products. *See* AB §§ 36-1102(a)(3)(ii), (b)(1) (excluding CBD from licensing requirement; requiring licensing for products with more than .5 mg THC per

24

serving that are "intended for human consumption or inhalation"). We shall not consider this market;

- The relevant market might be the market for psychoactive products made from the cannabis plant, both hemp-derived psychoactive products and marijuana products. The Cannabis Reform Act regulates precisely this market by prohibiting hemp-derived psychoactive products and by regulating marijuana products. AB § 36-1102(b), (c). Thus, this market seems like a likely candidate. In the following analysis, we will call this the "**broader cannabis market**";

- The relevant market might be the market for marijuana products. This seems more likely as much of the provisions of the Cannabis Reform Act concern this market. *See, e.g.*, AB §§ 36-1101, -1102, -1104 (regulating transportation, licensing, and product standards for delta-9 THC products). But this can't be the relevant market for this litigation because the Hemp Coalition and its members do not participate in this market, and we do not understand the Hemp Coalition to be challenging a market in which it has no stake. Accordingly, we do not consider this market further; or

- As the parties imply, but don't explain, the relevant market might be the market for hemp-derived psychoactive products. This doesn't seem right to us either. *First*, because the Cannabis Reform Act does so much more than regulate hemp-derived psychoactive products, it seems unlikely that it was intended to regulate the limited hemp-derived psychoactive products market only. *See* AB § 36-1102(a)(3)(i) (defining the products that fall under the law as including delta-9 THC products). *Second*, the Cannabis Reform Act doesn't permit the existence of a market for hemp-derived psychoactive products—it is a prohibition, not a monopoly. AB § 36-1102(c) ("A person may not sell or distribute a cannabinoid product that is not derived from naturally occurring biologically active chemical constituents."). We don't think that the relevant market is the market for hemp-derived psychoactive products. But because the parties might have conducted their Article 41 analysis as if the relevant market is the market for hemp-derived psychoactive products, we shall also analyze whether the Cannabis Reform Act creates an unconstitutional monopoly in this market. In the pages that follow, we will call this the "**limited hemp-derived psychoactive products market**."

The determination of the relevant market is neither theoretical nor academic. It affects whether a litigant can prove their Article 41 claims, it affects the type of analysis a

25

court performs, and it affects whether an alleged monopoly satisfies an exception under Article 41. *Cf. Am. Express Co.*, 585 U.S. at 542-43 (explaining that the Court could not analyze the plaintiffs' claims without defining the relevant market, and that, "once defined, it becomes clear that the plaintiffs' evidence is insufficient"). In fact, we think the failure to identify the relevant market led to confusion here. That is, the Hemp Coalition's arguments could apply to at least two markets—the broader cannabis market or the limited hemp-derived psychoactive products market. Given this ambiguity, we shall explain below how the Hemp Coalition cannot succeed on the argument that the Cannabis Reform Act creates an unconstitutional monopoly in either the broader cannabis market or the limited hemp-derived psychoactive products market because the law satisfies the common right and public interest exceptions to Article 41. *First*, the ability to sell cannabis and hemp-derived psychoactive products has not been a matter of common right. *Second*, the Cannabis Reform Act's licensing requirement, licensing limit, and social equity applicant designation are reasonably required for the public interest. In addition to describing how the Cannabis Reform Act's provisions meet these two exceptions to Article 41, we explain, *third*, why the Cannabis Reform Act's lottery system and application fee do not violate Article 41.

> a. **The Cannabis Reform Act Does Not Infringe on a Matter of Common Right**

The Cannabis Reform Act does not create an unconstitutional monopoly because it satisfies the common right exception to Article 41 by granting exclusive rights to markets that were previously prohibited. *See Levin*, 186 Md. at 183. There has never been a

26

common right to engage in the broader cannabis market prior to the enactment of the Cannabis Reform Act. There has also never been a common right to engage in the limited hemp-derived psychoactive products market. We address whether there was a common right to engage in each market in turn.

There has never been a common right to engage in the broader cannabis market. Historically, a combination of State and federal laws made cannabis products, including both hemp and marijuana products, illegal in one form or another until all cannabis production was eliminated in the 1950's. Moran, *supra*, at 403-05 (recounting the history of cannabis); AGRICULTURAL COMMODITY, *supra*, at 12-13 (same). Thus, for much of the last century, there was no common right to cultivate any cannabis plants or to use or sell any cannabis products. Moran, *supra*, at 403-05. Moreover, the federal prohibition on most cannabis products continues to this day. In particular, marijuana and some forms of THC have been and continue to be illegal under the Controlled Substances Act. 21 U.S.C. § 812(c)(c)(10), (17). As a result, there was not—nor has there ever been—a common right to engage in the broader cannabis market prior to the enactment of the Cannabis Reform Act.

There also has not been a common right to engage in the limited hemp-derived psychoactive products market prior to the enactment of the Cannabis Reform Act. It's true that, over the last few years, the federal government has relaxed regulations around the hemp plant, and, as a result, individuals began producing hemp-derived psychoactive products. Hemp production was legalized under the 2018 federal Farm Bill. 7 U.S.C. § 1639p-q. Producers of hemp-derived psychoactive products took advantage of the gaps

in both federal and Maryland law. *See* BIRENBAUM ET AL., *supra*, at § 25:10 (noting hemp-derived psychoactive products "containing new forms of THC … were not anticipated or envisioned by the 2014 and 2018 [federal] Farm Bills or the resulting State regulatory frameworks initially created thereunder"). But these developments do not demonstrate the existence of a "common right" to engage in the limited hemp-derived psychoactive products market. Hemp-derived psychoactive products, so-called delta-8 and delta-10 THC, are now and have always been illegal in Maryland. That their prohibition has been the subject of lax enforcement does not make it legal. There was not a common right to engage in this limited market for four reasons: (1) federal law did not establish a common right; (2) Maryland's hemp laws did not establish a common right; (3) the 2022 Maryland legislation prohibiting individuals under 21 from purchasing delta-8 or delta-10 THC products did not establish a common right; and (4) Maryland's lax regulation of the hemp market did not establish a common right.

*First*, Federal law did not establish that there was a common right to engage in the limited hemp-derived psychoactive products market prior to the enactment of the Cannabis Reform Act. Federal law only permits hemp cultivation and is in conflict about whether hemp-derived psychoactive products are legal. While the 2018 federal Farm Bill might permit hemp cultivation, a separate provision of the same statute indicates that hemp-derived psychoactive products are, in fact, prohibited. 7 U.S.C. § 1639r(c). That separate provision recognizes the authority of the FDA to regulate hemp under the Food, Drug, and Cosmetic Act. *Id.* The FDA has prohibited the sale of unapproved hemp-derived food or dietary supplements under the Food, Drug, and Cosmetic Act. *Hemp Production and the*

*2018 Farm Bill: Hearing Before the S. Comm. on Agric., Nutrition, and Forestry*, 116th

Cong. 49 (2019) (statement of Amy Abernethy, Principal Deputy commissioner, FDA).

The FDA has also issued warning letters against companies selling delta-8 products that

have violated the Food, Drug, and Cosmetic Act.[15] There cannot be a common right to sell

hemp-derived psychoactive products if those products are illegal or even if their legality is

uncertain. *See Wright*, 88 Md. at 443 (describing how a State grant only creates a monopoly

if it "hinder[s] … lawful trade" (citation omitted)). Given the conflict in federal law around

the legal status of hemp-derived psychoactive products, the Hemp Coalition cannot

establish a likelihood of success on the argument that, at the federal level, engaging in the

limited hemp-derived psychoactive products market was a matter of common right prior to

the enactment of the Cannabis Reform Act.

*Second*, Maryland's hemp laws did not create a common right to engage in the

limited hemp-derived psychoactive products market prior to the enactment of the Cannabis

Reform Act. Under the 2018 federal Farm Bill, once Maryland submitted its hemp plan to

USDA, Maryland, and not the USDA, had "primary regulatory authority over the

production of hemp" in the State. 7 U.S.C. § 1639p(a)(1). Thus, we look to Maryland's

agricultural hemp statute to determine if it authorized the production of hemp-derived

psychoactive products. It did not. Maryland's agricultural hemp statute includes explicit

---

[15] *FDA Issues Warning Letters to Companies Illegally Selling CBD and Delta-8 THC Products*, FDA (May 4, 2022), https://www.fda.gov/news-events/press-announcements/fda-issues-warning-letters-companies-illegally-selling-cbd-and-delta-8-thc-products.

language indicating that the General Assembly intended it to only authorize agricultural hemp products. AG § 14-101(c)(2) ("'Hemp' does not include any plant or part of a plant intended for a use that is regulated under [Maryland's former medical cannabis program]."); AG § 14-302(1) ("It is the intent of the General Assembly that … [h]emp be established as an agricultural commodity[.]"); *see also* HG §§ 13-3301 to -3316 (Natalie M. Laprade Medical Cannabis Commission) (repealed 2023). Additionally, while Maryland law permitted hemp cultivators to sell their hemp product to medical cannabis dispensaries, COMAR 10.62.22.03B(1) (repealed 2024), it never granted the right to produce or sell hemp-derived psychoactive products to the public. Thus, Maryland's agricultural hemp laws did not create a common right to engage in the limited hemp-derived psychoactive products market prior to the enactment of the Cannabis Reform Act. Accordingly, the Hemp Coalition has no likelihood of success on the merits of this argument.

*Third*, the 2022 Maryland law prohibiting the sale of delta-8 and delta-10 THC products to those under 21 did not create a common right to engage in the limited hemp-derived psychoactive products market. CR § 10-108. This law was enacted as part of a larger bill that ordered the Maryland Medical Cannabis Commission to study hemp-derived psychoactive products and recommend how those products should be regulated. 2022 Md. Laws ch. 511. The legislative history of this bill indicates that it was not endorsing or legalizing the sale of delta-8 and delta-10 products for those 21 or older. Several legislative

documents support this view. The floor report of the House Health and Government

Operations Committee,[16] for example, summarized the bill as follows:

> House bill 1078 prohibits certain persons from purchasing for
> or selling products containing delta–8 or delta–10 [THC] to an
> individual under the age of 21 years. The bill also requires the
> Medical Cannabis Commission, in consultation with the
> Department of Agriculture and certain stakeholders, to study
> and make recommendations on the classification and
> regulation of [THCs], other than delta–9 [THC].

H. HEALTH AND GOV'T OPERATIONS COMM., FLOOR REP., H.B. 1078, 2022 Leg., 444th

Sess., at 1 (Md. 2022). The Floor Report indicates that the Maryland General Assembly

considered this bill to be a stopgap measure—it would prohibit those under 21 from

acquiring delta-8 and delta-10 products while the General Assembly devised a way to

regulate these products comprehensively. *Id.* Moreover, written testimony from the

---

[16] "[A] key legislative history document in the bill file is the floor report." *Blackstone v. Sharma*, 461 Md. 87, 130 (2018); *see also Logan v. Dietz*, 258 Md. App. 629, 669 n.10 (2023) (noting that legislative fiscal and policy notes can be weaker indicators of legislative intent, as these notes are drafted by Department of Legislative Services staff and may not provide "the detail and nuances" that are included in floor reports). The floor report is a significant indicator of legislative intent for several reasons. The floor report is produced by the committee chair and its staff after public hearings and testimony on the bill. *Blackstone*, 461 Md. at 130 n.23. The floor report is the basis of the committee chair's comments on the chamber floor. It is the last thing that legislators hear before they vote. Moreover, it often provides in-depth information on a bill:

> "Floor reports generally provide … valuable clues … to the
> purpose underlying the bill, because floor reports often
> summarize the key testimony at hearings and the import of any
> significant amendments made in committee."

Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 MD. L. REV. 432, 442 (1995). Besides the language of the bill, the floor report reflects the closest thing we have to the intent of the Maryland General Assembly.

31

Medical Cannabis Commission, the former regulatory agency for medical cannabis in Maryland, explained the problem the bill was designed to solve:

> Neither the 2018 [federal] Farm Bill nor Maryland law address … delta-8, delta-10, … that provide a similar psychoactive effect or "high" to delta-9.
>
> Initially, this regulatory gap did not present an issue, because delta-8 and the other THC isomers only occur naturally in the cannabis plant in very trace amounts. However, manufacturers have identified cost-effective ways to chemically convert cannabidiol (CBD), which is not psychoactive, into delta-8, delta-10, and other psychoactive THC isomers.

*Cannabis – Regulation – Delta-8- and Delta-10-THC: Hearing on H.B. 1078 Before the Finance Committee*, 2022 Leg., 444th Sess. 1 (Md. 2022) (written statement of the Maryland Medical Cannabis Commission). This testimony strongly suggests that the bill was designed to address an unclear regulatory gap that permitted hemp-derived psychoactive products to exist. *Id.* That is far from a recognition that individuals had a legal right to sell these products. Simply put, this law didn't make hemp-derived psychoactive products legal for adults just because it made them illegal for minors. Thus, after reviewing the legislative history, we hold that this law did not create a common right to engage in the limited hemp-derived psychoactive products market prior to the enactment of the Cannabis Reform Act. These products are illegal and have always been illegal. The Hemp Coalition cannot demonstrate a likelihood of success on the merits of this argument.

*Fourth*, the fact that the regulation of Maryland's hemp market has been lax and that many hemp-derived psychoactive products are sold in stores across Maryland does not persuade us that engaging in this limited market was a common right. A person does not have a common right to an occupation under Article 41 unless it is a longstanding and well-

32

recognized occupation. *See Raney*, 170 Md. at 194 (surveying monopoly cases involving boarding houses, auctioneers, and printing companies). It follows that a person cannot have a common right to sell hemp-derived psychoactive products, which is a novel occupation no more than a decade old. The only explanation for businesses selling hemp-derived psychoactive products prior to the enactment of the Cannabis Reform Act is that the 2018 federal Farm Bill created uncertainty about the legal status of these products; this may also have contributed to a lack of enforcement around these products at the State level. *See* BIRENBAUM ET AL., *supra*, at § 25:10. But they are now and have always been illegal. Regardless of the reason why the enforcement of prohibitions on selling hemp-derived psychoactive products was lax, the lack of enforcement did not create a common right to engage in the hemp-derived psychoactive products market in Maryland prior to the enactment of the Cannabis Reform Act. The Hemp Coalition cannot establish a likelihood of success on this argument.

There has not been a common right to engage in the broader cannabis market. Additionally, Federal law, Maryland State hemp law, the 2022 Maryland legislation prohibiting cannabis for individuals under 21, and the formerly unregulated cannabis market did not establish that there was a common right to engage in the limited hemp-derived psychoactive products market. Thus, under the precedent we have discussed, this regulatory scheme fits into the independently sufficient "common right" exception to Article 41 by granting exclusive rights to markets that were previously prohibited. Accordingly, the circuit court erred as a matter of law in finding that the Hemp Coalition

was likely to succeed on its claim that the Cannabis Reform Act created an unconstitutional monopoly under Article 41.

### b. The Cannabis Reform Act Serves the Public Interest

In addition to satisfying the "common right" exception, the Cannabis Reform Act is also permissible under Article 41 because it is reasonably required for the public interest, and the Hemp Coalition cannot succeed in proving otherwise. As a result, the Cannabis Reform Act falls within the well-established, independently-sufficient public interest exception to Article 41. *See Levin*, 186 Md. at 182-83 (discussing public interest exception). In particular, the Cannabis Reform Act's licensing requirement is reasonably required for the public health, the numerical license limit is reasonably required for the public health, and the social equity applicant designation remedies past discrimination. We address these three provisions in turn.

#### i. *The Licensing Requirement is Reasonably Required for the Public Health*

The circuit court held that the licensing requirement violated Article 41 because it creates an exclusive, State-granted market for cannabis products. The Hemp Coalition echoes the circuit court and claims that the public will not benefit from a licensing requirement. We disagree. The licensing requirement is reasonably required to serve the public health in the broader cannabis market as well as the limited hemp-derived psychoactive products market. *See Levin*, 186 Md. at 182-83 (discussing public interest exception). Under the Cannabis Reform Act's licensing requirement, "[a] person may not sell or distribute a product intended for human consumption or inhalation that contains

34

more than 0.5 milligrams of [THC] per serving or 2.5 milligrams of [THC] per package unless the person is licensed[.]" AB § 36-1102(b)(1). Tied to the licensing requirement, licensees must comply with manufacturing, lab testing, packaging and labeling, and advertising standards. AB §§ 36-902, -903, -1102(b). In crafting this licensing requirement, the Maryland General Assembly considered how cannabis products in general and hemp-derived psychoactive products in particular could endanger public health. We address each type of product in turn.

In analyzing the public health dangers of cannabis products, such as delta-9 THC products, the Maryland General Assembly considered the dangers of cannabis to minors. REPORT ON CANNABIS USE BY MINORS, *supra*. The General Assembly learned that minors face three prominent public health dangers from cannabis products: first, that cannabis use could impair the brain development of minors; second, that cannabis businesses have been increasing the potency of THC in their products, which could lead to increased addiction and incidents of psychosis; finally, that States that legalized cannabis reported increases in emergency room visits and calls to poison control centers involving minors. *Id.* at 22, 26. To respond to these public health dangers, the report recommended that the General Assembly consider advertising, packaging and labeling, and potency regulations for businesses selling cannabis products that would reduce the appeal of cannabis products to minors and prevent adverse reactions from cannabis consumption. *Id.* at 24, 26, 27. These recommendations are reflected in the Cannabis Reform Act. AB §§ 36-203.1, -902, -903. Because the General Assembly designed the licensing requirement to protect minors from cannabis products, it was reasonably required for the public health.

The Maryland General Assembly also considered how hemp-derived psychoactive products could endanger public health. HEMP-DERIVED PSYCHOACTIVE PRODUCTS REPORT, *supra*. The General Assembly learned that consumers of hemp-derived psychoactive products faced three significant public health dangers prior to the enactment of the Cannabis Reform Act. First, many businesses had been selling hemp-derived psychoactive products containing dangerous levels of THC. *Id.* at 13. Second, hemp-derived psychoactive products lacked adequate warning labels. *Id.* at 11-12. Many of these products lacked warning labels altogether. *Id.* at 11. For those products that had warning labels, the warning labels often lacked key information, such as the fact that the product may impair the user or have psychoactive effects. *Id.* Moreover, many of these product labels misstated, by a significant margin, the amount of THC contained in the product. *Id.* at 12. Third, individuals under 21 could easily access these products at gas stations and other retail stores. *Id.* at 8. Although selling delta-8 and delta-10 products to those under 21 was illegal, CR § 10-108, many businesses failed to verify the age of customers. *Id.* at 11. All of these dangers may have contributed to an increase in poison control calls related to delta-8 products. *See id.* at 9-10. To prevent these public health dangers, the General Assembly reviewed several solutions: (1) imposing a licensing requirement for certain products; (2) distinguishing between psychoactive and non-psychoactive amounts of THC; (3) restricting hemp-derived psychoactive products that are synthetic. *Id.* at 27-30. All three of these recommendations were implemented in the Cannabis Reform Act. AB § 36-1102(b)(1) (requiring license for sale of products "that contain[] more than 0.5 milligrams of [THC] per serving."); AB § 36-1102(c) (prohibiting sale of cannabis products "not

36

derived from naturally occurring biologically active chemical constituents."). Because the General Assembly designed the licensing requirement to respond to and prevent the sale of dangerous hemp-derived psychoactive products, it was reasonably required to protect the public health.

To summarize, the Maryland General Assembly considered the dangers of both cannabis products generally and hemp-derived psychoactive products specifically and, in response, created a licensing requirement alongside product safety standards under the Cannabis Reform Act. We hold that the licensing requirement was reasonably required to protect the public health and fits within the public interest exception to Article 41. Accordingly, the Hemp Coalition cannot demonstrate a likelihood of success on its Article 41 claim. The circuit court erred in finding otherwise.

### ii. The Numerical License Limit is Reasonably Required for the Public Health

The circuit court held that the Cannabis Reform Act's limit on the number of cannabis licenses that may be issued violates Article 41 by limiting who may participate in the broader cannabis market. The circuit court further found that the public interest does not justify the cannabis license limit. This was error because the numerical license limit is reasonably required to serve the public health and thus satisfies the public interest exception to Article 41.

In adopting the numerical licensing limit, the Maryland General Assembly considered the type of and effect of cannabis licensing in other States. The Cannabis Reform Act limits the total number of cannabis licenses that can be granted to cannabis

growers, cannabis processors, and cannabis dispensers and for businesses that create incubator spaces and on-site cannabis consumption areas. AB § 36-401(d). For example, the Maryland Cannabis Administration may only grant a maximum of 300 standard dispensary licenses to businesses in Maryland. AB § 36-401(d)(1)(iii). The record reflects that in developing the Cannabis Reform Act's numerical licensing limits, the General Assembly heard testimony from health experts, such as the National Institute for Drug Abuse, on the range of licensing schemes that our sister States had implemented. For example, some States limited the amount of cannabis product that could be produced, but not the number of businesses that could produce them. The Maryland General Assembly received testimony that these States subsequently placed moratoriums on granting licenses because too many businesses were operating. The General Assembly heard that the proliferation of licenses in these other States led to two public health problems. First, in States that only limited the amount of cannabis product, cannabis was diverted to illicit uses both within and across State lines, including through organized crime. Second, these States could not oversee and enforce the regulatory schemes they created because they lacked the resources to police the large number of businesses operating. The General Assembly was thus aware of the risks of creating a licensing scheme without license limits prior to crafting the Cannabis Reform Act.

To address the issues encountered in other States, the record reflects that the Maryland General Assembly commissioned and incorporated findings from a study that analyzed the anticipated demand for legal cannabis in Maryland and recommended cannabis license limits that would protect the public health. MICHAEL SOFIS & MACKENZIE

38

SLADE, CANNABIS PUBLIC POLICY, FUTURE ADULT USE CANNABIS DEMAND & PREDICTIVE MODELING: A BEHAVIORAL ECONOMIC STUDY 3, 11, 20 (2023) [hereinafter DEMAND STUDY]. For example, the Demand Study recommended that "300 cannabis dispensaries would be an optimal number … to shift consumption from illicit markets to the adult use market without adding notable public health risks." *Id.* at 3. Not coincidentally, the General Assembly incorporated this limit of 300 dispensary licenses into the Cannabis Reform Act. AB § 36-401(d)(1)(iii).[17]

Based on the information considered by the Maryland General Assembly, the development of Maryland's numerical licensing limit exhibits a clear public health purpose to prevent diversion and sale of products that are unsafe. Thus, the numerical licensing limit satisfies the public interest exception to Article 41. The Hemp Coalition, as a result, cannot demonstrate a likelihood of success on the merits on its Article 41 claim, and the circuit court erred in finding that it had.

---

[17] The Hemp Coalition attacks the General Assembly's choice to allow only 300 dispensary licenses because the Demand Study shows that granting more than 300 licenses would have more quickly transitioned consumers to the licensed market. DEMAND STUDY, *supra*, at 16. The Demand Study recommended between 260-500 dispensary licenses to transition consumers to the licensed market. *Id.* at 14. The General Assembly's decision was thus within the range that the Demand Study recommended and, even if it wasn't, the Maryland General Assembly is not required to design the most optimal legislation to achieve its policies. *See Pizza di Joey*, 470 Md. at 352 (holding the General Assembly "exercises a large discretion in determining what the public welfare requires." (citation omitted)). The Maryland General Assembly, not the Judiciary, must make the difficult policy decisions. Our responsibility is only to ensure that those decisions are reasonably related to their goals.

The circuit court found that the social equity applicant designation violated Article 41 because it further limits the individuals who can receive a license. The Hemp Coalition argues that such an exclusive grant to a small category of social equity applicants creates an unconstitutional monopoly. We disagree.

The Cannabis Reform Act's social equity applicant designation is reasonably required for the public interest because it is designed to remedy past harms caused by the War on Drugs. The Maryland General Assembly, through the Cannabis Reform Act, acknowledged that certain communities have borne the brunt of our State's (and its political subdivisions') historic ban on the use of cannabis products and sought to remedy this harm by allowing, and at times requiring, license applicants to demonstrate that they are "social equity applicants." AB § 36-101(ff). A social equity applicant is a license applicant that meets the following criteria:

(1)    has at least 65% ownership and control held by one or more individuals who:

   (i)    have lived in a disproportionately impacted area for at least 5 of the 10 years immediately preceding the submission of the application;

   (ii)    attended a public school in a disproportionately impacted area for at least 5 years; or

   (iii)    for at least 2 years, attended a 4-year institution of higher education in the State where at least 40% of the individuals who attend the institution of higher education are eligible for a Pell Grant; or

(2)     meets any other criteria established by the Administration.

*Id.* A disproportionately impacted area is "a geographic area identified by the Office of Social Equity that has had above 150% of the State's 10-year average for cannabis possession charges." AB § 36-101(r). In crafting the social equity applicant designation, the General Assembly heard testimony from policy experts on social equity programs and considered a policy document called the "Adult-Use Cannabis Social Equity Tool Kit."[18] BRIANNE SCHELL AND MATHEW SWINBURNE, THE NETWORK FOR PUBLIC HEALTH LAW, ADULT-USE CANNABIS SOCIAL EQUITY TOOL KIT (2022) [hereinafter TOOL KIT]. The Tool Kit outlines the ways our sister States have defined a social equity applicant, including by considering areas disproportionately impacted by the War on Drugs, arrest rates, and income. *Id.* at 7-9. From these considerations, the General Assembly chose to define a social equity applicant as a person who lived or attended a public school in an area in which people were disproportionately affected by cannabis charges or who went to a university in which a certain percentage of students received Pell Grants. AB § 36-101(ff). The record establishes that, through the Cannabis Reform Act's social equity applicant designation, the General Assembly has attempted to redress serious disparities in how the State (and its political subdivisions) enforced the War on Drugs. The remedial purpose of the social equity applicant designation indicates that it is reasonably required for the public interest and fits within that exception to Article 41. Accordingly, the Hemp Coalition cannot

---

[18] The information that the General Assembly considered involving social equity applicants will be discussed in more detail below. *See infra* State's Appeal Section I.C.2.

demonstrate a likelihood of success on its Article 41 claim, and the circuit court erred in finding it could.

The Cannabis Reform Act's licensing requirement is reasonably required for the public health, its numerical license limit is reasonably required for the public health, and its social equity applicant designation is reasonably required for the public interest because it remedies past discrimination. Accordingly, these three provisions fit within the public interest exception to Article 41. That the public interest exception applies is sufficient, on its own, to establish that, in the broader cannabis market as well as the limited hemp-derived psychoactive products market, the Cannabis Reform Act does not violate Article 41. Thus, the Hemp Coalition cannot establish a likelihood of success on its Article 41 claims as a matter of law, and the circuit court erred in finding so.

### c. The Cannabis Reform Act's Lottery System and Application Fee Do Not Violate Article 41

The circuit court found in its opinion granting the preliminary injunction, and the Hemp Coalition argues on appeal, that the Cannabis Reform Act's lottery system and application fee violate Article 41.[19] In particular, the Hemp Coalition argues that the

---

[19] The Hemp Coalition also argues that the Cannabis Reform Act is too strict compared to other highly regulated industries, and that a regulatory monopoly is not permitted by the ballot referendum that established the right to use cannabis products in Article XX of the Maryland Constitution. These two arguments were not preserved in the circuit court and are thus waived. MD. R. 8-131(a). Even if these arguments were preserved, however, the Hemp Coalition could not establish a likelihood of success on the merits of these arguments.

The Hemp Coalition argues that other heavily regulated markets, such as the liquor market, are not subject to licensing limits. This is incorrect. Local liquor regulators can, and do, restrict the number of liquor licenses in the areas they oversee. AB § 4-202(d)(1);

application fee restricts the class of people who may apply and that the use of a lottery to determine who receives a license is unfair. We disagree.

An economic regulation does not violate Article 41 if it is applied uniformly. *See Supermarkets General Corp.*, 286 Md. at 627 (finding Sunday closing laws do not violate Article 41 because they "provide[], uniformly, conditions under which [businesses] may operate"). Here, the application fee and lottery system are applied uniformly. Under the Cannabis Reform Act, all cannabis license applicants must pay an application fee, the

---

*see, e.g.*, AB § 16-1601(a)(1)(i) (limiting certain liquor licenses in Carroll County to one for every 5,000 people); AB § 17-1601(a)(1) (limiting liquor licenses in Cecil County to one for every 400 registered voters); AB § 9-1604 (limiting Class C liquor licenses in Allegany County to 60); AB § 23-1601(b)(2) (limiting Class A liquor licenses in Howard County to one for every 4,000 residents in an election district). That Maryland has numerical limits on the number of liquor licenses underscores why the Cannabis Reform Act's license limits satisfy the public interest exception to Article 41. Much like liquor license limits, the Cannabis Reform Act's license limits are designed to ensure intoxicating substances are safe and effectively regulated. *See Dundalk Liquor Co. v. Tawes*, 201 Md. 58, 65 (1952) (stating liquor industry is heavily regulated because of "the social evils ordinarily incident to [its] abuse" and that liquor licenses will be upheld to prevent such abuse); *see supra* State's Appeal Section I.B.2.b.i, ii. In other words, both numerical limitations are designed to protect the public health. As a result, the analogy to alcohol regulation does not accrue to the Hemp Coalition's benefit.

The Hemp Coalition also alleges that Maryland voters, in passing the constitutional amendment to cannabis use enshrined in Article XX, did not grant the Maryland General Assembly the ability to limit the number of licenses. This too is incorrect. The language of the constitutional amendment was proposed by the General Assembly, approved by the voters, and adopted without changes into its current form, which states that "[t]he General Assembly shall, by law, provide for the use, distribution, possession, regulation, and taxation of cannabis within the State." MD. CONST. art. XX, § 1(b). The General Assembly had the authority to create a licensing scheme within the Cannabis Reform Act. First, the constitutional amendment specifically directed the General Assembly to "provide for the … regulation … of cannabis," *id.*, and that is what the licensing scheme in the Cannabis Reform Act does. Second, this instruction to the General Assembly to regulate cannabis products does not limit the General Assembly's plenary power to determine who may participate in the cannabis market. *See supra* note 5.

amount of which is based on the type of license for which they apply. AB § 36-403(c).

Additionally, the Cannabis Reform Act grants licenses by lottery during certain license

rounds. AB §§ 36-404(d)(1), -404(f)(2), (g)(1). Both the application fee and the lottery are

applied to all applicants who reach those stages in the application process.

AB §§ 36-404(d)(1), -404(f)(2), (g)(1). Thus, because license applicants are uniformly

subject to the application fee and lottery, neither component of the Cannabis Reform Act

violates Article 41.[20]

The ability to engage in the broader cannabis market generally and the limited

hemp-derived psychoactive products market specifically is not a matter of common right,

the Cannabis Reform Act is reasonably required for protecting the public interest, and its

lottery system and application fee do not violate Article 41. Accordingly, the Cannabis

Reform Act does not create an unconstitutional monopoly under Article 41 of the Maryland

---

[20] The circuit court found that the purpose of the Cannabis Reform Act is price-fixing, and the Hemp Coalition continues to support this allegation on appeal. Even if controlling price was a purpose of the Cannabis Reform Act, and even if the General Assembly achieved that purpose, the Cannabis Reform Act would still be permissible because it protects the public health and therefore satisfies the public interest exception under Article 41. *See supra* State's Appeal Section I.B.2.b.i, ii; *see also Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 56 (1973) ("That [a] statute may undertake indirectly to control prices and affect competition does not *per se* render it invidious or unconstitutional[.]") To be sure, regulating the price of psychoactive cannabis products was one topic considered by the General Assembly and in the Demand Study that the General Assembly commissioned. DEMAND STUDY, *supra*, at 18. The Demand Study recommended an optimal number of licenses needed to reduce the amount of illicit cannabis in the market and help transition consumers from the illicit to the regulated market. *Id.* at 17, 21. The Demand Study thus indicates that, even if the Cannabis Reform Act was designed to regulate supply and demand, it was also designed to provide an optimal market that would ensure cannabis users would transition to purchasing safe products—a public health purpose that does not violate Article 41.

Declaration of Rights. The circuit court erred as a matter of law in finding that the Hemp Coalition was likely to overcome the Cannabis Reform Act's presumption of constitutionality and succeed on the merits of its facial Article 41 challenge.

C.      Article 24 Equal Protection Claim

The circuit court also found that the Hemp Coalition was likely to succeed on the merits of its argument that the Cannabis Reform Act violated the equal protection component of Article 24 of the Maryland Declaration of Rights. Specifically, it found that the Hemp Coalition was likely to succeed on the merits of its argument that the social equity applicant designation in the Cannabis Reform Act was irrational. This finding was erroneous as a matter of law. Our analysis proceeds as follows. *First*, we outline the deferential review afforded regulatory schemes such as the Cannabis Reform Act under Article 24. *Second*, we hold that the Cannabis Reform Act's social equity program is not arbitrary. *Third*, we determine that the use of zip codes in the social equity program is not arbitrary. *Fourth*, we explain why the social equity program is permissible even if it is overinclusive or underinclusive. *Fifth*, we conclude that the cannabis license application review program is not arbitrary.

1.      *Background on Article 24*

Article 24 of the Maryland Declaration of Rights states "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." The Article's language is derived from the Magna Carta and has been part of the Maryland Declaration of Rights since 1776.

45

*History, Development, and Interpretation*, *supra*, at 660, 660 n.370. It has had only minor

alterations since then. *Id.* at 660.

Maryland courts have long recognized that Article 24 contains an implicit equal

protection component. *Att'y Gen. of Maryland v. Waldron*, 289 Md. 683, 704 n.8 (1981).[21]

The relationship between the federal and State equal protection guarantees is "independent

[and] capable of divergent effect" but also "so intertwined that they, in essence, form a

double helix, each complementing the other." *Id.* at 705. Federal cases interpreting the 14th

Amendment Equal Protection Clause are persuasive authority in interpreting the equal

---

[21] Until recently, there was no obvious textual basis for the *Waldron* Court's determination that there is an equal protection component built into Article 24's guarantee that all persons are entitled to the benefits of the "Law of the Land." The *Waldron* Court justified that finding solely by reference to the decision in *Bolling v. Sharpe*, in which the U.S. Supreme Court had found the existence of an equal protection component in the 5th Amendment's guarantee of due process of law. *Waldron*, 289 Md. at 704 n.8 (citing *Bolling*, 347 U.S. 497 (1954)). *Bolling*, in turn, had explained that any other outcome (except requiring the federal government and that of the District of Columbia to comply with the guarantee of equal protection of the laws) would have been "unthinkable." *Bolling*, 347 U.S. at 500; *see also* Dan Friedman*, The Special Laws Prohibition, Maryland's Charter Counties, and the "Avoidance of Unthinkable Outcomes,"* 83 MD. L. REV. ONLINE 28, 55-60 (2023) [hereinafter *Unthinkable Outcomes*]. Despite this seemingly shaky textual basis (and despite significant academic criticism of *Bolling*), *Unthinkable Outcomes*, *supra*, at 57 n.114, neither the United States Supreme Court nor the Supreme Court of Maryland has been interested in abandoning this holding. *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 225-27 (1995) (relying on *Bolling*); *Pizza di Joey*, 470 Md. at 347-52 (relying on *Waldron*). Recent developments, however, have shored up the once-shaky footings of the *Waldron* holding. In 2024, the People of Maryland amended our Constitution to guarantee the right to reproductive freedom. 2023 Md. Laws chs. 244-245; MD. CONST., Decl. of Rts., art. 48. In so doing, the People of Maryland recognized the background existence of an "individual's rights to liberty and equality," MD. CONST., Decl. of Rts., art. 48, which confirmed and provided a firmer textual basis for the *Waldron* holding that the Maryland Constitution provides an equal protection guarantee.

protection component of Article 24. *Id.* Thus, the Maryland and federal equal protection doctrines are closely related.

### a. Similarities Between the Maryland and Federal Equal Protection Doctrines: Three-Tier Analysis

One way in which Maryland and the federal equal protection doctrines align is that courts employ a three-tier analysis under which the constitutionality of a law is scrutinized: strict scrutiny; intermediate scrutiny; and rational basis review. *Pizza di Joey*, 470 Md. at 346-48. Courts apply strict scrutiny when a statute implicates either a fundamental right or a suspect class. *Id.* at 346 (citation omitted). Under strict scrutiny, a statute will be overturned unless it "is necessary to promote a compelling governmental interest." *Id.* (citation omitted). Courts apply intermediate scrutiny to statutes that burden "important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord." *Id.* at 347 (citation omitted). Courts applying intermediate scrutiny will uphold a statute if it "serve[s] important government objectives and [is] substantially related to the achievement of those objectives." *Id.* at 347-48 (citation omitted). And courts apply rational basis review to economic statutes that do not infringe on a fundamental or important personal right and do not burden a suspect class. *Id.* at 346-48. A statute will be upheld under rational basis review if it is "rationally related to a legitimate government interest." *Id.* at 347 (citation omitted). Here, because the Cannabis Reform Act does not infringe on a fundamental right or important personal right, and because it does not burden a suspect class, we review it under the rational basis standard.

*Charm City Hemp,* 2025 WL 2165173, at \*18 ("[T]he current … licensing system does not (and did not) discriminate on grounds of race or gender.").

> **b.** **Differences Between the Maryland and Federal Equal Protection Doctrines: Heightened vs. Deferential Rational Basis Review**

One way in which Maryland and federal equal protection doctrines differ is in how courts apply rational basis review. Under the federal constitution, the courts apply a uniform rational basis review to all economic legislation. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Under this standard of review, a court will uphold a statute if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citation omitted). Under Maryland's Declaration of Rights, we review economic statutes under either a deferential rational basis review similar to the federal courts, or, under certain circumstances, a separate "heightened rational basis review." *Washington v. State*, 450 Md. 319, 344 (2016) (quoting *Beach Commc'ns*, 508 U.S. at 313) (applying deferential rational basis review); *Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 570 (2025) (applying heightened rational basis review). This heightened standard of review differs in two respects from traditional deferential rational basis review. *First*, under this heightened rational basis review, courts will only uphold a statute "if it bears a 'real and substantial relation to the problem addressed by the statute.'" *Archbishop of Washington*, 489 Md. at 571 (citation omitted). *Second*, applying heightened rational basis review, courts "do not accept 'any reasonably conceivable state of facts that could provide a rational basis'" for the challenged statute, but "will consider only 'those purposes that are obvious from the text or legislative history of the enactment,

48

those plausibly identified by the litigants, or those provided by some other authoritative source.'" *Id.* (citation omitted). Thus, using heightened rational basis review, courts cannot speculate as to whether the statute has a rational basis; they, instead, must only examine a statute's identified purposes and the ways in which those purposes are achieved.

Heightened rational basis review is applied in circumstances involving (1) livelihood; (2) an arbitrary classification such as geography; or (3) the resurrection of a remedy. *Waldron*, 289 Md. at 728; *Verzi v. Baltimore County*, 333 Md. 411, 419 (1994); *Archbishop of Washington,* 489 Md. at 570. Heightened rational basis review applies under the first circumstance, in which a statute affects people's livelihood, if the statute "effectively den[ies] a class of business operators the ability to practice their trade entirely[.]" *Pizza di Joey*, 470 Md. at 352. Heightened rational basis review applies under the second circumstance, an arbitrary classification, if the statute discriminates against a class of businesses based on an arbitrary factor such as geography. *See Verzi*, 333 Md. at 413, 419, 426 (applying heightened rational basis review to county ordinance that excluded out-of-county towing operators from receiving towing requests in the county). Finally, heightened rational basis review applies under the third circumstance, resurrection of a remedy, when a statute "retroactively resurrects a remedy that had previously been precluded by a statute of limitations." *Archbishop of Washington*, 489 Md. at 570. Below, we explain why none of these three circumstances apply to this case.

The first circumstance, livelihood, does not apply here because the Cannabis Reform Act is not a blanket prohibition on doing business in the cannabis market. Growers, processors, and dispensers of cannabis products can still sell their products if they obtain a

license. AB § 36-1102(b)-(c). Even without a license, a business may sell a hemp-derived "tincture," as that product is defined in the statute. AB § 36-1102(a)(4), (d). Finally, hemp farmers may still sell their product to licensed cannabis processors without being licensed under the Cannabis Reform Act themselves. COMAR 14.17.11.03.B.(2).[22] Thus, we do not apply heightened rational basis review here because the Cannabis Reform Act is not a blanket ban on participating in the cannabis market.

The second circumstance in which heightened rational basis review is appropriate, an arbitrary classification, does not apply here either. The Cannabis Reform Act's social equity classification, which defines social equity applicants in part based on geography, is not arbitrary, but is designed to remedy the harms to communities affected by cannabis's prior prohibition. The law does so by defining social equity applicants in part as those who lived or studied in "disproportionately impacted areas," which are zip codes having "above

---

[22] The Hemp Coalition alleges and the circuit court found that hemp growers cannot sell their hemp to licensed processors because of a system called METRC. Overseen by the Maryland Cannabis Administration, METRC is the system that tracks licensed cannabis products from the moment they are grown and follows the products throughout the chain of commerce. COMAR 14.17.02.02.; *Charm City Hemp,* 2025 WL 2165173, at *5; METRC, https://perma.cc/T6YM-B3LA. The Hemp Coalition claims that hemp businesses are not allowed to enter their hemp products into the METRC system without a cannabis license. This is a misunderstanding of the METRC system, which does, in fact, allow hemp growers to sell their product to cannabis licensees. It is the licensee, not the hemp grower, that is tracked by the METRC system. Hemp growers may sell their hemp product to a licensee, and the licensee then has the responsibility of getting the hemp approved through METRC. *Charm City Hemp,* 2025 WL 2165173, at *5; *see Hemp Acquisition Form,* MARYLAND CANNABIS ADMINISTRATION, https://perma.cc/48YH-UE44 (displaying the form licensees can submit to acquire hemp from hemp growers). The METRC system does not prevent hemp growers from selling their product, and thus does not impair the constitutionality of the Cannabis Reform Act.

150% of the State's 10-year average for cannabis possession charges." AB § 36-101(r), (ff). The language of the Cannabis Reform Act thus indicates a close tie between the equity-based purpose of the law and the geographic classification used to achieve that purpose. The close tie between the purpose and the classification in this case is distinguishable from the arbitrary economic protectionism that was held unconstitutional under heightened rational basis review in *Verzi*. *See Pizza di Joey*, 241 Md. App. at 174 ("*Verzi* does not stand for the blanket proposition that legislation favoring one set of businesses over another is categorically impermissible—only that a Dormant Commerce Clause-esque preference grounded in geography or residence is."). In addition, the Cannabis Reform Act does not favor one region to the exclusion of others as the ordinance in *Verzi* did. The ordinance in *Verzi* expressly favored businesses in Baltimore County, *Verzi*, 333 Md. at 414, 427, but the social equity applicant designation here employs a neutral, statistically-based definition and uses zip codes as the lens through which those statistics are measured. AB § 36-101(ff), (r). Thus, because the Cannabis Reform Act's geographic designation is not arbitrary, we do not apply heightened rational basis review.

Finally, the third circumstance, resurrection of a remedy, does not apply here. The "exceptionally rare" circumstances under which the Maryland Supreme Court applied heightened rational basis review to resurrect a remedy are not applicable in this case because, here, we do not review a law that retroactively resurrects a remedy precluded by a statute of limitations. *Archbishop of Washington*, 489 Md. at 570. Accordingly, we decline to apply heightened rational basis review under this third circumstance.

Heightened rational basis review is inappropriate here under any of the three circumstances under which it may be applied. We, thus, review the Cannabis Reform Act under deferential rational basis review.

2.      *The Cannabis Reform Act Satisfies Deferential Rational Basis Review*

The issue is then whether the Hemp Coalition can establish a likelihood of success on the merits of its Article 24 challenge to the Cannabis Reform Act under the most deferential rational basis review. Under this standard, we accept "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Frey v. Comptroller of Treasury*, 422 Md. 111, 178 (2011) (citation omitted). We uphold a statute under deferential rational basis review unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court may conclude only that the governmental actions were arbitrary or irrational." *Tyler v. City of College Park*, 415 Md. 475, 501 (2010).

The Cannabis Reform Act's social equity applicant designation is rationally related to legitimate, non-arbitrary government interests. We first address the legitimate government interests the law promotes, and then explain how the means used to reach those interests are rational.

Considering the record and the language of the statute, the social equity applicant designation is intended to redress harms to communities affected by the War on Drugs and create a more inclusive cannabis industry. *See* H.B. 556 Floor Report, *supra*, at 1 ("The bill addresses a shift in our society's approach to cannabis … away from the [W]ar on [D]rugs[.]"); AB §§ 36-101(r), (ff) (basing definition of "social equity applicant" and

52

"disproportionately impacted area" on charging data and receipt of government benefits); TOOL KIT, *supra*, at 7 (listing arrest rates and receipt of government benefits as way to measure a disparately impacted community). These are legitimate State interests.

The Maryland General Assembly has a legitimate State interest in remedying the War on Drugs and creating a more inclusive cannabis industry for several reasons. *First*, the War on Drugs has disproportionately harmed communities. Drug charges are often concentrated in particular communities rather than dispersed evenly, and those disproportionately impacted communities bear the burden of reintegrating many individuals formerly incarcerated for drug crimes. Jamila Jefferson-Jones, *"Community Dignity Takings": Dehumanization and Infantilization of Communities Resulting from the War on Drugs*, 66 U. KAN. L. REV. 993, 993 n.3, 1007-08 (2018). These formerly incarcerated individuals have difficulty acquiring employment, housing, and education upon reentry, and the communities they live in suffer as a result. *See id.* at 993-94, 999 (describing the collateral consequences of those convicted of drug crimes). Accordingly, the General Assembly may have determined that equitable initiatives were required to remedy the harm done to communities by the War on Drugs. *Second*, the General Assembly was presented with evidence about economic barriers to participation in the legal cannabis market. For example, the average startup cost for cannabis businesses in other States is between $312,000 and $500,000. Mathew Swinburne & Kathleen Hoke, *State Efforts to Create an Inclusive Marijuana Industry in the Shadow of the Unjust War on Drugs*, 15 J. BUS. & TECH. L. 235, 255 (2020). Additionally, financial institutions often avoid financing cannabis businesses for fear of violating federal law; this, in turn, has created an industry

in which only those who have the wealth to self-fund their businesses can succeed. *Id.* at 256. These financial barriers could lead to a few large cannabis businesses dominating a State's cannabis market. *Id.* at 257. From this evidence, the General Assembly may have determined that prioritizing access to the cannabis market to economically disadvantaged individuals was an important means to creating an inclusive cannabis industry. *Third*, the General Assembly considered and followed the direction of 19 other States that have sought to redress the harms from the War on Drugs through social equity policies. TOOL KIT, *supra*, at 3. Given the evidence on disparate drug enforcement at the community level, barriers to economic participation in the cannabis industry, and the social equity policies of our sister States, the General Assembly has legitimate State interests in redressing the War on Drugs and creating an inclusive cannabis industry.

We hold that the means used to redress the State's legitimate interests are rational and non-arbitrary. In designing the social equity applicant designation, the Maryland General Assembly reviewed the social equity Tool Kit and expert testimony, which outlined ways in which States have attempted to create more inclusive cannabis industries. TOOL KIT, *supra*, at 3-4. The General Assembly learned that the prohibition against cannabis has impacted communities as well as individuals, and that the Cannabis Reform Act might measure the areas most impacted using criminal justice and economic statistics. *Id.* at 7-8. The General Assembly considered that 14 States award social equity status based on whether a licensee is from a disproportionately impacted area, and this area was defined in a variety of ways, including by arrest and conviction rates, unemployment, poverty, and receipt of government benefits. *Id.* at 7. After considering this information, the General

54

Assembly adopted a mix of these factors, awarding social equity status based on living or attending school in a zip code with a significant cannabis conviction rate or going to a university in which 40% of students are eligible to receive government benefits. AB § 36-101(ff). Based on these facts, there is a rational relation between the General Assembly's goal—redressing the social harms caused by the War on Drugs—and the means used to achieve that goal—defining a social equity applicant by using factors that attempt to ascertain the communities most harmed by the War on Drugs. Thus, the social equity applicant designation is rationally related to legitimate State interests. In reaching this conclusion, we recognize that the "Legislature exercises a large discretion in determining what the public welfare requires," and we will not substitute our judgment for the General Assembly's. *Pizza di Joey*, 470 Md. at 352 (citation omitted). For these reasons, the Cannabis Reform Act has a rational basis as a matter of law. *Charm City Hemp,* 2025 WL 2165173, at *19 (rejecting federal equal protection challenge to the Cannabis Reform Act's licensing scheme under rational basis review because plaintiff's "protestations amount to distaste for the [General Assembly's] policy choices"). Accordingly, the Hemp Coalition cannot establish a likelihood of success on its Article 24 claim, and the circuit court erred in finding otherwise.

### 3. *The Use of Zip Codes in the Social Equity Applicant Program is Not Arbitrary*

In its opinion granting the preliminary injunction, the circuit court found, and the Hemp Coalition argues here, that the use of zip codes to define a "disproportionately impacted area" is irrational. We disagree. The Cannabis Reform Act created the Office of

55

Social Equity and gave it authority to determine how to measure a "disproportionately impacted area." AB § 36-101(r). Testimony in the circuit court indicates the Office of Social Equity determined zip codes were the appropriate geographic area for three reasons. First, during the legislative session in which the General Assembly crafted the Cannabis Reform Act, the General Assembly reviewed drug charging data in the State by zip codes. Accordingly, the Office of Social Equity's use of zip codes was rational because it was consistent with how the General Assembly, the drafters of the social equity program, understood disproportionately impacted areas. Second, the use of zip codes was rational because they provide the most consistent data. Testimony in the circuit court revealed that the Office of Social Equity considered several ways in which a geographic area could have been measured, including measuring by county. In considering these types of geographic areas, the Office of Social Equity discovered that, in State cannabis charging data, zip codes were the only geographic area that was consistently included, and other geographic areas were not always listed. Finally, as we discuss more fully below, the fact that the use of zip codes may neglect certain people who should be considered social equity applicants or include those who shouldn't, does not impact whether the use of zip codes is rational. *See Pizza di Joey*, 470 Md. at 357 ("Our role is not to screen for bad policy, but for unconstitutional legislation." (citation omitted)). Thus, the use of zip codes is not arbitrary because the Office of Social Equity chose zip codes to be consistent with the General Assembly's understanding of disproportionately impacted areas, and because zip codes are a consistently available geographic area tied to cannabis charging data.

56

### 4. The Social Equity Program is Permissible Under Article 24 Even If It is Overinclusive or Underinclusive

In its opinion, the circuit court found that the Cannabis Reform Act was both overinclusive and underinclusive, and the Hemp Coalition echoes that claim. In particular, the Hemp Coalition alleges that there is no evidence that the social equity applicant scheme will benefit those areas disproportionately impacted by cannabis's historical prohibition. In other words, they argue the law is overinclusive because it benefits areas not harmed by cannabis prohibition and underinclusive because it neglects areas actually harmed. These arguments ask more of the State and the General Assembly than they are required to provide. Even if "the General Assembly could have more closely tailored its solution," rational basis review "does not require that the chosen legislative solution be the most narrowly tailored…. [I]t is the prerogative of the political branches … to make those policy choices." *Archbishop of Washington*, 489 Md. at 574-75. A law that, as here, has a rational basis does not violate equal protection even if it is not made with "mathematical nicety" or "results in some inequality." *Tyler*, 415 Md. at 501 (citation omitted). This is especially true when the Legislature is "'dealing with a serious problem in a new and untried fashion' … '[in those cases,] courts are under a special duty to respect the legislative judgment[.]'" *Pizza di Joey*, 470 Md. at 353 (citation omitted). Because the Cannabis Reform Act pioneers a regulatory scheme, we refuse to declare it arbitrary because of concerns about the General Assembly's policy choices.

5.    *The Cannabis License Application Review Program is Not Arbitrary*

Finally, during the hearing on the preliminary injunction, the Hemp Coalition claimed that the Maryland Cannabis Administration, which reviews cannabis license applications, is unaccountable. On appeal, the Hemp Coalition argues that the Cannabis Reform Act is arbitrary because those who review the cannabis license applications are unaccountable, because records of decisions are not made or kept, and because the decisionmakers are not subject to any guidelines. These assertions are, however, factually incorrect. The Maryland Cannabis Administration reviews applications and determines if an applicant meets the minimum qualifications for the lottery. AB § 36-404(d)(2). An applicant who is not entered into the lottery may request to review the agency's records to verify why they were found ineligible. COMAR 14.17.05.07.A. Upon reviewing their records, applicants whose applications were denied may request a hearing. COMAR 14.17.05.07.B. Moreover, an applicant who receives an unfavorable determination in an administrative hearing may appeal that determination to the circuit court to be reviewed by a circuit judge. COMAR 14.17.22.12. Thus, the process by which the Maryland Cannabis Administration reviews cannabis license applications is not unaccountable and therefore not arbitrary.

Because the Cannabis Reform Act is rationally related to legitimate State interests, we hold that there exists a set of facts under which it would be valid. Accordingly, applying the presumption of constitutionality, the Cannabis Reform Act does not violate equal protection under Article 24. The Hemp Coalition has no likelihood of success on its facial Article 24 claim. The circuit court erred in finding otherwise.

The Hemp Coalition cannot overcome the Cannabis Reform Act's presumption of constitutionality and succeed under a preemption theory or under its facial Article 41 or Article 24 claims. As such, the circuit court erred as a matter of law in finding that the first preliminary injunction factor, likelihood of success on the merits, weighs in favor of granting a preliminary injunction. Because the "failure to prove … even one of the four" preliminary injunction factors precludes injunctive relief, *Ademiluyi*, 466 Md. at 115 (citation omitted), the Hemp Coalition's failure to establish a likelihood of success on the merits is outcome determinative; without a likelihood of success on the merits, the preliminary injunction must be dissolved. We will, however, briefly review the remaining three factors—the balance of convenience, the public interest, and irreparable injury.

## II.    BALANCE OF CONVENIENCE

The circuit court found that the balance of convenience favored the Hemp Coalition. Under this element, courts weigh whether the harm faced by the State from the grant of the preliminary injunction outweighs the harm that the Hemp Coalition would have faced from a denial. *Ademiluyi*, 466 Md. at 131. The circuit court analyzed this factor as follows:

> The balance of convenience weighs strongly in [the Hemp Coalition's] favor. They were selling their products until suddenly prohibited from doing so on July 1,[23] when the licensing scheme became effective. They do not contest the increased health and safety requirements and have agreed to implement them with their products. While resolving all surrounding issues of the [Cannabis Reform Act] as it applies to hemp and hemp products, [the State] will not be affected.

---

[23] We note that the Cannabis Reform Act took effect on May 3, not July 1. *See supra* note 6.

> Their roll out of the new market for delta-9 [THC] products
> will continue.

The circuit court thus found that the balance of convenience weighs in favor of the Hemp Coalition because it and its members cannot sell their products despite voluntary compliance with the Cannabis Reform Act's safety measures, and because the State will be unharmed by the limited scope of the injunction.

The circuit court abused its discretion regarding the balance of convenience because the record does not "support[] a reasonable conclusion that [the] appropriate factors were taken into account in the exercise of discretion." *Ademiluyi*, 466 Md. at 131 (citation omitted). While the circuit court properly recognized the important business interests that the Hemp Coalition has for an injunction, it misperceived the State's interests.

The State's interest is not the mere implementation of a regulatory scheme; it is ensuring the health and safety of Maryland residents. *See* H.B. 556 Floor Report, *supra*, at 2 ("[W]e seek to make sure Marylanders who consume cannabis are safe, with openly, legally obtained and tested cannabis … products."). The State's health and safety interests are not outweighed by the Hemp Coalition's interests for two reasons. *First*, the voluntary assurances of a number of businesses do not safeguard the health and welfare of the public. The Hemp Coalition and its members are not the only hemp businesses in the State that sell hemp-derived psychoactive products. Members of the Hemp Coalition testified in the circuit court that there are businesses not part of the Hemp Coalition that sell hemp-derived psychoactive products, and that these businesses "don't care about quality control" and "don't pay attention to lab testing" their products. Absent a cannabis licensing regime,

these bad actors can continue to sell untested, unsafe products. Thus, the Hemp Coalition's promise of voluntary cooperation is hollow. The circuit court neglected this consideration. *Second*, the State's public health interest is obstructed by allowing, as the circuit court did, businesses that sell hemp-derived psychoactive products to operate unlicensed. The record is clear that hemp-derived psychoactive products, if unregulated, are dangerous. *See supra* State's Appeal Section I.B.2.b.i. The Maryland General Assembly had information stating that labels on hemp-derived psychoactive products have misstated their THC potency by 10% or more, that they have omitted key information such as the risk of impaired driving or the products' psychoactive effects, and that businesses selling these products often do not verify the purchaser's age. HEMP-DERIVED PSYCHOACTIVE PRODUCTS REPORT, *supra*, at 11, 12. The Cannabis Reform Act's licensing program serves to protect the public health, and these interests can only be served by a licensing scheme that covers *all* cannabis products. For these reasons, we hold that the circuit court abused its discretion in finding that the balance of convenience weighed in favor of the Hemp Coalition.

## III. PUBLIC INTEREST

The circuit court abused its discretion in finding that the public interest weighed in favor of the Hemp Coalition. "[I]n cases in which injunctive relief directly impacts governmental interests," courts "may … go much farther both to give and withhold relief in furtherance of the public interest than … when only private interests are involved." *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 37 (2007) (citation omitted). Under this factor, the circuit court found the following:

> The public benefits from any industry that is well regulated for health and safety but open to variety and competition. Variety in products is best assured by issuing the injunction to allow [the Hemp Coalition] businesses to continue without being encumbered under the new draconian licensing scheme. With competition, pricing will fall and the market will better adjust to the purchasers' demands. Again, competition is best assured by issuing an injunction. As this case is not about standardizing health and safety regulations but is about the ability of persons to engage in lawful business, the public interest weighs heavily in favor of the [Hemp Coalition].

This finding was an abuse of discretion. Under this factor, the circuit court failed to consider the important public interests the State attempts to achieve under the Cannabis Reform Act, including protecting the public health. *See supra* State's Appeal Section I.B.2.b.i, ii. The public cannot enjoy a variety of low-cost hemp products in a competitive market if those products are dangerous and, absent the ability to regulate hemp under the Cannabis Reform Act, the record establishes they would be. HEMP-DERIVED PSYCHOACTIVE PRODUCTS REPORT, *supra*, at 8-10. Because the Cannabis Reform Act is designed to protect the public through health and safety regulations, the circuit court abused its discretion in finding that the public interest weighed in favor of the Hemp Coalition.

## IV.  IRREPARABLE INJURY

The circuit court exercised proper discretion in finding the Hemp Coalition would face irreparable injury. For a movant to establish an irreparable injury, the injury "need not 'be beyond all possibility of compensation in damages, nor need it be very great.'" *Ademiluyi*, 466 Md. at 133-34 (citation omitted). Maryland courts have long held that the termination of a party's business constitutes an irreparable injury. *DMF Leasing, Inc. v.*

*Budget Rent-A-Car of Maryland, Inc.*, 161 Md. App. 640, 651-52 (2005) (holding termination of auto rental franchise an irreparable injury). Here, the circuit court found the Hemp Coalition would suffer an irreparable injury because "[w]ithout an injunction, [the members of the Hemp Coalition] are either out of business or unable to purchase the products on which they have come to rely." The circuit court did not abuse its discretion in finding that the termination of the Hemp Coalition's business would constitute an irreparable injury. Moreover, the State does not contest on appeal that the Hemp Coalition would have suffered an irreparable injury. Thus, the circuit court properly exercised discretion in finding the Hemp Coalition would suffer irreparable injury absent a preliminary injunction.[24]

In conclusion, we determine that the circuit court erred in finding that the Hemp Coalition was likely to succeed on the merits of its claims; that it abused its discretion in finding that the balance of convenience weighed in favor of the Hemp Coalition; that it also abused its discretion in finding that the public interest favored the Hemp Coalition; that it exercised proper discretion, however, in finding that the Hemp Coalition would suffer irreparable harm. Thus, three of the four preliminary injunction factors weigh in favor of the State. Accordingly, the circuit court abused its discretion in granting the Hemp

---

[24] Our holding with respect to whether the Hemp Coalition has demonstrated irreparable injury is inconsistent with that reached by the federal court. *Charm City Hemp*, 2025 WL 2165173, at *24. The difference is the procedural posture. Our federal sister found, in the first instance, that the Hemp Coalition was unlikely to suffer irreparable injury as a result of enforcement efforts. *Id.* In this case, the circuit court found that the loss of potential revenue is an irreparable injury. We would not hold either finding to be an abuse of discretion.

Coalition's preliminary injunction. We, therefore, reverse the grant of the preliminary injunction.

## THE HEMP COALITION'S CROSS-APPEAL

We turn to the Hemp Coalition's cross-appeal, which involves the State's issuance of licenses under the Cannabis Reform Act. The circuit court's order, while enjoining the State from enforcing the Cannabis Reform Act against businesses selling hemp-derived psychoactive products, did not enjoin the State from issuing licenses under the Cannabis Reform Act's licensing scheme. In its cross-appeal, the Hemp Coalition argues that the circuit court's refusal to enjoin the State from issuing future licenses was erroneous because the State could continue to commit the alleged constitutional violations caused by the social equity applicant designation. The State replies that the Hemp Coalition's claims are not justiciable. In particular, the State argues the Hemp Coalition does not have standing to challenge the issuance of licenses because it did not apply for a license, nor could it speculate about whether the social equity applicant designation will be used in license rounds beyond the second round.

For a court to entertain a claim, it must be justiciable. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 590 (2014). A claim is justiciable if "there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Id.* at 591 (citation omitted) (emphasis omitted). Claims must be justiciable to prevent "courts [from] rendering purely advisory opinions." *Id.* (citation omitted). To establish justiciability, a claimant must overcome "numerous hurdles," *id.*, three of which are relevant here: standing, mootness, and ripeness.

64

While we assume, without deciding, that the Hemp Coalition has standing to challenge the issuance of licenses, the Hemp Coalition's challenge ultimately fails. It fails because the Hemp Coalition's challenge to the first round of licenses is moot and because the Hemp Coalition's challenge to subsequent license rounds is not yet ripe. Thus, we affirm the part of the circuit court's order permitting the State to continue issuing licenses. We address standing, mootness, and ripeness in turn.

I.     STANDING

To establish standing, a claimant must be aggrieved, meaning they have "an interest such that [they are] personally and specifically affected in a way different from the public generally." *Pizza di Joey*, 470 Md. at 343 (citation omitted). For example, the food trucks in *Pizza di Joey* were aggrieved by the law they were challenging because the law frustrated their business plans and because it prevented them from operating in Baltimore City neighborhoods in which they would have raised substantial revenues. *Id.* at 344.

Here, the circumstances the Hemp Coalition faces are less clear. The first round of cannabis licenses has already been granted, but the members of the Hemp Coalition did not apply for licenses in that first round. *Charm City Hemp,* 2025 WL 2165173, at *11. On the other hand, the record reflects that the Hemp Coalition and its members submitted affidavits attesting that they were ready and able to be licensed, but that they did not qualify as a social equity applicant under the first round of licensing.[25]

---

[25] These affidavits do not shed light on whether the Hemp Coalition will be denied a license in subsequent rounds because subsequent rounds have different application

65

Based on the circumstances of the Hemp Coalition, we assume, without deciding, that it and its members have standing to challenge the issuance of licenses. Because the Hemp Coalition did not apply in the first round, we do not know whether it and its members would have been denied a license and would have been aggrieved by the economic consequences that a denial entails. On the other hand, the affidavits submitted by the Hemp Coalition and its members shed light on whether the Hemp Coalition may have been aggrieved by a denial had it or its members applied. Thus, the record supports that the Hemp Coalition or some of its members might have been aggrieved had they applied for the first round of licenses, and therefore, it may be that they have standing to challenge the licensing scheme. We assume, without deciding, that the Hemp Coalition and its members have standing to challenge the issuance of licenses.

Though the Hemp Coalition has survived the first hurdle of justiciability, standing, its claim fails because its challenge to the first round of licenses is moot and its challenge to subsequent rounds is not yet ripe.

## II. MOOTNESS

The Hemp Coalition's claim against the issuance of first round licenses is moot. We typically do not render judgment on the merits of a moot claim. *La Valle v. La Valle*, 432 Md. 343, 351 (2013). A claim is moot if "past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter

---

requirements than those in the first round. AB § 36-404. We touch on this concern in our discussion on mootness below. *See infra* Hemp Coalition's Cross-Appeal Section II.

would be without effect." *Id.* (citation omitted). In *La Valle*, for instance, the Court determined that an issue regarding the validity of an extension of a protective order was moot because the protective order expired prior to the Court granting certiorari and, thus, the Court's decision would neither affect the expired protective order nor would it affect the consequences that flowed from that order. *Id.* at 352-53. Here, similar reasoning applies. The Hemp Coalition challenges the issuance of licenses generally, but the first round of licenses has already been issued. As such, even if we were to enjoin the State from issuing licenses, it would neither affect the licenses issued in the first round nor would it affect any consequences to the Hemp Coalition that flow from the issuance of first round licenses. Thus, the Hemp Coalition's challenge to the issuance of first round licenses is moot and we decline to reach the merits of that challenge.

## III. RIPENESS

The Hemp Coalition's claim against the issuance of future licenses is not yet ripe and thus we cannot review it. Much like mootness, we do not render judgment on the merits of a claim that is not yet ripe. *Pizza di Joey*, 470 Md. at 340. A claim is not yet ripe if "it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain." *Id.* (citation omitted). In *Pizza di Joey*, our State's Supreme Court determined that food truck operators' claims were ripe against a regulation because the regulation's "contours are visible: the 300-foot rule requires mobile vendors to keep their distance from direct brick-and-mortar competitors, in ways we can measure and draw on maps[.]" *Id.* at 342 (citation omitted). Unlike the well-defined regulation in *Pizza di Joey*, the way in which future licenses will

67

be issued under the Cannabis Reform Act here is uncertain. Based on the results of a disparity study[26] conducted by the State, licenses may be issued under the second round in two ways. AB § 36-404(f), (g); *Charm City Hemp,* 2025 WL 2165173, at *4. If a disparity study demonstrates "a strong basis in evidence of business discrimination" against minority and women owned businesses in the cannabis market, the Maryland Cannabis Administration will issue the second round of licenses through a "lottery system employing remedial measures." AB § 36-404(f)(1), (2). If the disparity study does not demonstrate a strong basis in evidence of discrimination against minority and women owned businesses

---

[26] The purpose of a disparity study is to ensure that government programs that involve suspect classifications, such as race or gender, comply with the equal protection guarantees of Article 24 of the Maryland Declaration of Rights and the 14th Amendment to the U.S. Constitution. *City of Richmond v. J.A. Croson Co*., 488 U.S. 469 (1989); *Doe v. Alternative Med. Maryland, LLC*, 455 Md. 377, 395-96 (2017) (describing a disparity study in the medical cannabis industry); *see also Adarand*, 515 U.S. at 222-24 (extending holding in *Croson* to the equal protection component of the 5th Amendment to the U.S. Constitution). To justify race-conscious government programs, the State must satisfy strict scrutiny, which requires the State to establish it has a compelling government interest in "remedying the effects of past or present racial discrimination." *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010) (citation omitted). A State has a compelling interest in remedying past racial discrimination if the State identifies racial discrimination in an industry "with some specificity" and demonstrates a "strong basis in evidence" that remedial action is necessary to rectify the discrimination. *Croson*, 488 U.S. at 504, 500. On the other hand, to justify gender-conscious government programs, the State must satisfy intermediate scrutiny such that the program serves important government objectives, and the gender-based classification is substantially related to the achievement of those objectives. *Tippett*, 615 F.3d at 242. To demonstrate an important government interest in remedying past gender-based discrimination, a State must provide something less than a "strong basis in evidence" that remedial action is necessary. *Id.* at 242 (citation omitted). A disparity study is thus how the State determines if there is a "strong basis in evidence" of discrimination against minorities in a particular local or State industry. *See* Letter from Anthony Brown, Md. Att'y Gen., to Wes Moore, Md. Gov. at 4 (Apr. 26, 2023), https://perma.cc/WB58-R2N9 (determining that the Cannabis Reform Act's use of a disparity study complies with the equal protection guarantee of the U.S. Constitution).

in the cannabis market, then the Maryland Cannabis Administration will issue most of the second round of licenses through a lottery without remedial measures, and anyone who meets the minimum application requirements will be entered into the lottery. AB § 36-404(g)(1), (2). In subsequent rounds, the Maryland Cannabis Administration will "award licenses as needed in accordance with a market demand study" and, at its discretion, it may limit licenses to social equity applicants or employ "remedial measures" if a disparity study demonstrates discrimination against minority and women owned businesses in the cannabis market. AB § 36-404(h). "Remedial measures" are not, and have yet to be, defined. *Charm City Hemp,* 2025 WL 2165173, at *4, *13. Additionally, to our understanding, neither the second nor subsequent rounds have yet occurred. *Id.* Thus, based on the record and the statutory provisions listed, the makeup of the second and subsequent license rounds is uncertain for many reasons. We do not know, for instance, the following: (1) whether a future disparity study will demonstrate discrimination in the cannabis market in the second or subsequent rounds; (2) what "remedial measures" the Maryland Cannabis Administration might employ in the second or subsequent rounds; (3) whether or how many licenses will be issued in subsequent rounds after the second based on a market demand study; (4) whether, in subsequent rounds after the second, licenses will be limited to social equity applicants. Because the way in which the second and subsequent rounds of licenses will be issued is uncertain for various reasons, we cannot determine whether the Hemp Coalition's claims against such rounds would be meritorious. Thus, the Hemp Coalition's challenge to future licensing rounds is not ripe and we will not address its merits at this time.

We affirm the circuit court's decision to permit the issuance of licenses under the Cannabis Reform Act because, assuming the Hemp Coalition has standing to challenge the issuance of licenses, its claims are either moot or not ripe.

## CONCLUSION

We reverse the circuit court's preliminary injunction against the enforcement of AB § 36-1102 for persons selling hemp-derived psychoactive products prior to the enactment of the Cannabis Reform Act. We affirm the circuit court's decision to permit the issuance of licenses under the Cannabis Reform Act.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS REVERSED IN PART AND AFFIRMED IN PART. COSTS TO BE PAID BY APPELLEES/CROSS-APPELLANTS.**

Judge Zic joins in the judgment only.